**Doil Edward LANE, Appellant,**

v.

**STATE of Texas, Appellee.**

No. 71835.

Court of Criminal Appeals of Texas,
En Banc.

Nov. 6, 1996.

Verna Victoria Langham, New Braunfels, for appellant.

Michael S. Wenk, Asst. Dist. Atty., San Marcos, Matthew Paul, State's Atty., Austin, for the State.

## OPINION

KELLER, Judge.

In a trial beginning in January of 1994, appellant was convicted of the capital murder of eight-year-old Bertha Martinez committed on March 20, 1980, in Hays County.[1] The

---

1. Texas Penal Code § 19.03(a)(2) provides that a person commits capital murder when "the per-

son intentionally commits the murder in the

jury answered the punishment issues in the State's favor, and appellant was sentenced to death. Direct appeal to this Court is automatic under Article 37.0711(j).[2] Appellant raises thirteen points of error on appeal. We will affirm.

### 1. Sufficiency of the evidence

#### a. *Underlying offense*

The capital murder count in the jury charge contained the underlying offenses of kidnapping and aggravated sexual assault. In various oral confessions, appellant admitted to kidnapping, sexually assaulting, and murdering the victim. In point of error ten, appellant contends that the evidence is insufficient to support his conviction because there is insufficient proof of corpus delicti for kidnapping and there is no "direct" evidence that appellant committed an aggravated sexual assault.

■■■ Evidence is sufficient when, viewed in the light most favorable to the verdict, a rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In a capital murder prosecution, the evidence need only be sufficient to establish one of the underlying felonies in the indictment. *Matamoros v. State,* 901 S.W.2d 470, 474 (Tex. Crim.App.1995). *Pinkerton v. State,* 660 S.W.2d 58, 62 (Tex.Crim.App.1983).

■■■ Appellant concedes that the State proved the corpus delicti of aggravated sexual assault; therefore, we need not address whether the corpus delicti for kidnapping was proven so long as the evidence of aggravated sexual assault is otherwise sufficient. Once corpus delicti requirements are satisfied, a confession to the crime is, by itself, sufficient evidence to support a conviction. *Fisher v. State,* 851 S.W.2d 298, 304 (Tex. Crim.App.1993). Appellant confessed to raping and murdering Bertha Martinez. This

confession constitutes sufficient evidence to support the capital murder conviction. *See also Muniz v. State,* 851 S.W.2d 238, 243–249 (Tex.Crim.App.), *cert. denied,* 510 U.S. 837, 114 S.Ct. 116, 126 L.Ed.2d 82 (1993). Point of error ten is overruled.

#### b. *Future dangerousness*

■■ In point of error eleven, appellant contends that the evidence is insufficient to support the jury's finding of future dangerousness[3] in the punishment phase of the trial. As in questions of guilt, we examine the evidence in the light most favorable to the jury's determination, and we inquire whether any rational jury could have made that determination beyond a reasonable doubt. *Matamoros,* 901 S.W.2d at 474.

■■■ The State offered evidence of appellant's future dangerousness through both character testimony and specific instances of conduct. Appellant's sex offender probation officer testified that appellant repeatedly engaged in inappropriate acts of sexual conduct, including the hoarding of female underwear. In the probation officer's opinion, appellant would continue to commit criminal acts of violence in the future including inappropriate sexual behavior in prison. A jail sergeant testified that appellant collected, in his prison cell, pictures of little girls cut out of newspapers and magazines. The jail sergeant also believed that appellant would be a future danger to society. The opinion of law enforcement officers, derived from their observations of a defendant, about that defendant's character and the likelihood of future violence, is some evidence of future dangerousness. *Chambers v. State,* 866 S.W.2d 9, 17 (Tex.Crim.App.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1871, 128 L.Ed.2d 491 (1994).

Further, a neighbor testified that she saw a hangman's noose on a tree near appellant's house. When she took the noose down, appellant began cursing and screaming and told

course of committing or attempting to commit ... kidnapping ... [or] aggravated rape...."

**2.** All references to articles refer to the Texas Code of Criminal Procedure unless otherwise indicated.

**3.** The issue, required by Article 37.0711 § 3(b)(2), asks: "whether there is a probability that the defendant would commit criminal acts of violence which would constitute a continuing threat to society."

her that she did not know what she had done to herself. On a subsequent day, appellant and a blond-haired boy exited a car and walked toward the neighbor's children. When they saw the neighbor on her porch, they became startled, ran back to their car, and drove away. As he was driving away, appellant beat the steering wheel, cursing and screaming. The jury could have interpreted appellant's actions as an attempt to take the children for the commission of offenses similar to the one on trial. These events involving the neighbor, while perhaps not alone enough to support a finding of future dangerousness, constitute some evidence in that regard. *See Banda v. State,* 890 S.W.2d 42, 51 (Tex.Crim.App.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2253, 132 L.Ed.2d 260 (1995) (defendant, convicted of capital murder in the course of aggravated sexual assault and burglary, threw woman up against a wall and tried to kiss her after she rebuffed his sexual advances).

Richard Coons, a psychiatrist, testified that appellant possessed multiple sexual disorders, including pervasive/chronic pedophilia. Coons characterized appellant's sexual drive towards children as "severe" and "including violence." The psychiatrist also diagnosed appellant as having antisocial personality disorder. Coons further characterized appellant as "compulsive, driven, sexually obsessed" and "violent." Appellant exhibited "abnormal sexual behavior and a clear willingness to utilize aggression and violence to accomplish those means." Coons was unable to detect evidence of a conscience within appellant, and the psychiatrist specifically predicted that appellant would engage in violent sexual behavior against males in prison. Psychiatric testimony that a person constitutes a continuing threat to society is, generally, especially persuasive evidence of future dangerousness. *Fisher v. State,* 851 S.W.2d 298, 304 (Tex.Crim.App.1993).

Perhaps the most significant evidence of future dangerousness is the evidence that appellant participated in another capital murder. In oral confessions, appellant admitted to participating in the 1990 kidnapping, rape, and murder of nine-year-old Nancy Shoemaker in Wichita, Kansas. We have recognized that participation in an offense similar to the one on trial constitutes evidence of future dangerousness. *Coleman v. State,* 881 S.W.2d 344, 347 (Tex.Crim.App.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 763, 130 L.Ed.2d 660 (1995). *See also Barrientes v. State,* 752 S.W.2d 524, 526–527 (Tex.Crim. App.1987), *cert. denied,* 487 U.S. 1241, 108 S.Ct. 2915, 101 L.Ed.2d 947 (1988). The evidence in the present case is sufficient to show that appellant constitutes a future danger to society. Point of error eleven is overruled.

### c. *Mitigating circumstances*

In point of error twelve, appellant argues that the evidence is insufficient to support the jury's "no" answer to the statutory *"Penry"* special issue,[4] or alternatively, that the inability to conduct meaningful review of the issue renders the capital sentencing scheme unconstitutional under the Eighth Amendment. We have already rejected this type of claim. The *"Penry"* issue is not subject to appellate review, and the failure to offer meaningful review of the issue does not violate the Eighth Amendment. *McFarland v. State,* 928 S.W.2d 482, 485–87 (Tex.Crim.App.1996). *See also Id.* (Keller, J. concurring).

### 2. Incomplete record?

In point of error thirteen, appellant contends that the record is incomplete through no fault of his own. He claims that volume eight of the statement of facts is missing and that the entire defense exhibit volume is missing. He argues that defense exhibit four is especially important to advancing points of error on appeal. After examining the statement of facts we have located volume eight. The only defense exhibit that was admitted

---

4. The issue, required by Art. 37.0711 § 3(e), asks: Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

into evidence was defense exhibit four. Pursuant to the State's motion to supplement, the record now includes the original defense exhibit four. Point of error thirteen is overruled.

### 3. Confessions

#### a. *Voluntariness*

In points of error one through six, appellant challenges the voluntariness of his confessions to the murders of Bertha Martinez ("Bertha") and Nancy Shoemaker ("Nancy"). He alleges that the police obtained the confessions in violation of Article 38.21, the Fifth and Fourteenth Amendments to the United States Constitution, and Article I § 10 of the Texas Constitution. He argues that the police took advantage of his mental retardation by using clever psychological techniques, making his confession the product of suggestion. To evaluate this claim, we first review the events leading to and surrounding the confessions.

On April 25, 1991, the police in Wichita, Kansas interviewed appellant in connection with Nancy's murder. The interview lasted one hour and was terminated when appellant requested a lawyer. During the interview, appellant offered an alibi involving Joyce Wacker. The police later learned from Joyce Wacker that the alibi was false. On April 26, appellant contacted the Wichita police and asked that they contact people who would verify that his bus was not running when Nancy disappeared. This communication was apparently an attempt to fabricate another alibi.

During the ensuing investigation, appellant made repeated phone calls to the Exploited and Missing Children's Unit of the Wichita police department. Detective Snyder eventually explained to appellant that he needed to make an appointment if he wanted to talk.

On July 9, appellant was under surveillance by the police. That day, appellant flagged down officers riding in their car, asked for a ride home, and offered the officers cantaloupe to eat. On July 13, appellant told the officers that he could verify that Dwayne Peterson (who told officers that appellant had admitted involvement in Nancy's murder) was lying. At that time, Detective Snyder mentioned the idea of taking a polygraph test. At some point, appellant also gave officers a list of dates on which he donated blood—another apparent attempt to establish an alibi.

On July 15, appellant contacted Detective Snyder and asked him to interview some old neighbors who would say that appellant had nothing to do with Nancy's murder. Later that day, appellant contacted another detective and requested a polygraph examination.

On the morning of July 16, appellant contacted another officer and asked if Snyder had received the message that appellant desired to take a polygraph examination. FBI agent Napier, a trained polygraph examiner, came to the police station. Napier talked with Wichita police about interviewing techniques.

At approximately 11:40 a.m. that day, an officer drove appellant to the police station.[5] Appellant voluntarily accompanied the officer. At approximately 11:55 a.m., police officers gave appellant warnings that complied with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant acknowledged his understanding of each individual warning. The police permitted appellant to talk about any subject he wished and only asked occasional follow-up questions to subjects introduced by appellant.

Sometime between 12:40 p.m. and 12:55 p.m., appellant told officers that he wanted to go home. The police told appellant that he was free to leave, and they offered to take him home if he needed their assistance. At that point, appellant changed his mind and decided that he wished to continue the interview. Later information revealed that appellant had wanted to return home to retrieve girls' panties for the police to inspect.

Soon afterwards, appellant stated, "This wouldn't have happened if I had got help." He explained that his mother and stepfather forced him to wear girls panties when he was a child. Later, appellant began to admit his involvement in the Nancy murder by stating

---

5. Appellant did not have a valid driver's license.

"I didn't do it, but I'll tell you about it if that's what you want me to say." Agent Napier responded that the police were not interested in being pleased but only wanted to hear the truth. Appellant acknowledged that the police only wanted the truth, and he purported to tell the truth in his remaining statements. Appellant thereafter confessed that he killed Nancy, and officers began asking questions about the details.

At approximately 4:00 p.m., the police asked appellant if he would permit them to tape-record a statement. Appellant consented, and the tape recorder was placed in the open and turned on. *Miranda* warnings were repeated. They consisted of warnings that (1) he had a right to remain silent, (2) anything he said could be used against him in court, (3) he had a right to a lawyer for advice before and during questioning, (4) if he could not hire a lawyer, the court would appoint one for him, and (5) if he decided to answer questions now without a lawyer, he could stop answering at any time and he also had the right to stop answering until he talked to a lawyer. For each warning, appellant individually acknowledged that he understood it. The officers then asked if appellant wished to continue to talk to them. Appellant acknowledged that he did. For future reference, we refer to the procedures followed by the Kansas officers in this paragraph as the "recordings procedure."

The taped interview was a condensed version of the information obtained during the earlier untaped conversations. The taped interview was in the nature of a question and answer session similar to the direct examination of a trial witness. During the interview, appellant admitted to participating in the kidnapping, sexual assault, and murder of Nancy. At approximately 4:30 p.m., the police asked if appellant would talk about the Bertha case. Appellant agreed to talk and did not seem to be surprised. He subsequently admitted involvement in Bertha's murder and gave details. At approximately 6:45 p.m., officers followed the "recordings procedure," except that, instead of asking if he wished to continue talking, the officers asked appellant to confirm that he had agreed to talk with them. The taped statement was similar in nature to the one about Nancy's murder except that Bertha's murder was the subject. During the taped interview, appellant admitted to participating in the kidnapping, sexual assault, and murder of Bertha.

At the end of the interview (approximately 7:06 p.m.), officers told appellant that they might want to speak to him again. Appellant acknowledged that he would be agreeable to further interviews. An officer drove appellant home at approximately 7:15 p.m. Later that evening, appellant was arrested.

On the next day, July 17, at approximately 3:05 p.m., two officers from the San Marcos, Texas police department questioned appellant about the Bertha murder. The interrogation was tape-recorded at the outset, following the "recordings procedure" except that the officers did not ask appellant, after reading his rights, if he still wanted to talk to them. Early in the interview, one of the Texas officers told appellant that they had "already talked to Woody"—one of the accomplices in Bertha's murder and appellant's stepfather—and generally knew "his story as to what happened." The officer told appellant, "But we want to hear it from you." A little later in the interview, the following colloquy developed:

OFFICER: Did you do anything over at the City Park?

APPELLANT: Yeah, the way Woody forces everything in my life.

OFFICER: What did Woody force you to do? That's what we want to know. What did Woody force you to do?

APPELLANT: I don't want to talk about it.

OFFICER: I know you don't Doil, but you're doing alright man. (Lane [appellant] is crying and he and Richards [the officer] are talking at the same time). Hey, you're doing alright man. What..tell me, what did Woody force you to do there?

APPELLANT: But would you and her talked [sic] about them about letting me get out today?

OFFICER: We'll talk ... we'll talk about that later, you know, but we're ... we

came all the way from Texas to listen to *your side of the story.*

APPELLANT: Can ... let me get one more cigarette.

OFFICER: To listen to your side of what Woody has already told us, and I feel, you know, it's only fair that we let you do that. So tell ... tell us what Woody forced you to do to her. Come ahead Doil.

Appellant stated that Woody had forced him to sexually assault Bertha. This story conformed to what he had already told the Kansas police the day before. As he had the day before, appellant also admitted to being involved in the murder.

Sometime on July 17, Detective Snyder contacted Donny Wacker, whom appellant implicated as an accomplice in Nancy's murder. Appellant had characterized Wacker as the primary actor. When contacted, Wacker admitted involvement in the murder but characterized appellant as the primary actor. At approximately 5:15 p.m., the Kansas officers conducted a second taped interview concerning Nancy's murder. The "recordings procedure" was followed except that, instead of asking if he wished to continue talking, the officers asked appellant to confirm that he had agreed to talk with them. During the interview, Detective Snyder stated that he had talked to Donny Wacker and that there were discrepancies between Wacker's and appellant's stories. Snyder did not tell appellant what those discrepancies were. Appellant subsequently admitted that he was the primary actor, that he had raped and strangled Nancy.

Appellant concedes that the interviews were "low key." Agent Napier characterized the interviews as "very low key, professional, gentle, nonconfrontational, supportive, and empathetic." Although Napier and the Kansas officers discussed in advance how to approach the interview, they did not discuss appellant's intellectual capacity. There was

some discussion about appellant needing a "father-figure." Napier testified that he did not change his interviewing style based upon the intelligence of the suspect but always conducted interviews in a soft-spoken manner. He testified that, for less intelligent people, the only difference in the interview would be the use of simpler language. Appellant, however, never appeared to have a problem comprehending the officers; so, the language used did not vary significantly from an interview with a person of average intelligence. One of the Texas officers testified that appellant appeared to understand the questions being asked. The officers, however, did appear to know that appellant's intelligence may have been below average. There were no threats, violence, or promises in any of the interviews. Although appellant never asked for food during the interviews, he was given drinks upon request and permitted to smoke cigarettes.[6] At trial, appellant called an expert to testify that appellant was mentally retarded with an intellectual and emotional age of about 10 to 12 years.

Appellant does not challenge police compliance with *Miranda* or Article 38.22. Instead, he argues that his will was overborne by techniques used during the police interrogation. He claims that the police took advantage of his mental retardation, his emotionalism, and his need to please authority figures. He accuses the officers of using a "false friend" technique, and he complains that the officers planned their approach to the interview by conferring with doctors, psychologists, and amongst themselves. Appellant also claims that police surveillance of him constituted harassment and contributed to the psychological pressures he suffered.

Involuntary confessions offend due process only when they flow from the improper conduct of law enforcement officials.[7] *Colorado v. Connelly,* 479 U.S. 157, 163–167, 107 S.Ct. 515, 519–522, 93 L.Ed.2d

---

6. Officers testified that they had been prepared to provide food if appellant desired some.

7. Appellant alleges that Article 38.21 and the Texas Constitution provide broader protection than the federal constitution, but he does not explain how the protection differs, nor does he explain why the state provisions in the present

case should be interpreted more expansively. We decline to make appellant's arguments for him. Therefore, we will address the issues solely on federal grounds. *Johnson v. State,* 853 S.W.2d 527, 533 (Tex.Crim.App.1992), *cert. denied,* 510 U.S. 852, 114 S.Ct. 154, 126 L.Ed.2d 115 (1993).

473 (1986). In determining whether police conduct is improper, the court should take into account police knowledge of a suspect's special weaknesses, including youth and low intelligence. *Gallegos v. Colorado*, 370 U.S. 49, 53–55, 82 S.Ct. 1209, 1212–1213, 8 L.Ed.2d 325 (1962) (suspect's young age taken into account in determining whether police actions were unduly coercive). *Armstrong v. State*, 718 S.W.2d 686, 693 (Tex. Crim.App.1985). Whether a given confession was involuntary as a matter of fact (apart from the prophylactic rules imposed by *Miranda*) must be decided by the totality of the circumstances on an individual basis. *Gallegos*, 370 U.S. at 52, 82 S.Ct. at 1211. *Armstrong*, 718 S.W.2d at 693. Some relevant circumstances include the length of detention and interrogation, whether the defendant was permitted access to his family or an attorney, and the presence or absence of physical brutality. *Armstrong*, 718 S.W.2d at 693.

Several cases have addressed the voluntariness of a confession by a suspect of abnormally low intelligence. In *Reck v. Pate*, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961), a nineteen-year-old youth of subnormal intelligence was held in custody for four days before he confessed. *Id.* at 441, 81 S.Ct. at 1546. During the that time, he "was subjected each day to six- or seven-hour stretches of relentless and incessant interrogation." *Id.* He was shuttled back and forth between police stations and interrogation rooms and intermittently faced public exhibition in "show-ups." *Id.* During this period of time, the suspect became ill, but the police continued the interrogation until the suspect became faint and vomited blood on the floor. He was taken overnight to the hospital and given drugs but removed the next morning, in a wheel chair, for resumed intensive interrogation. *Id.* The Supreme Court concluded that the combination of circumstances rendered the resulting confession involuntary. *Id.* at 442, 81 S.Ct. at 1547.

In *Smith v. State*, 779 S.W.2d 417 (Tex. Crim.App.1989), the defendant claimed his confession was involuntary due to:

his mental deficiency and resultant deference to authority; the fact he was questioned more or less continuously for eight hours without having slept the night before, and without being fed; and repeated attacks on his veracity.

*Id.* at 428. We found that other circumstances militated in favor of finding the confession voluntary, including:

appellant's desire to take the polygraph, his expressed willingness to stay through the afternoon despite his lack of sustenance, and the fact he did not appear to have been tired or uncomprehending.

*Id.* We also noted that the defendant was *Mirandized* three times and each time acknowledged that he understood, and we found that the defendant actually consulted counsel and was free at all times to do so. *Id.* Although the question was close in light of the defendant's limited intelligence, we concluded that his "will was not unconstitutionally overborne by police coercion." *Id.*

 In the present case, factors supporting the voluntariness of appellant's confessions weigh much more favorably than in *Smith.* Appellant had contacted the Wichita police numerous times to the point of being a nuisance. He initiated the chain of events leading to his interviews by twice calling the police and requesting a polygraph test. While appellant may have possessed a limited IQ, he was in no way browbeaten by the police officers. He successfully terminated an interview on April 25 by requesting a lawyer. And, he initiated numerous attempts to mislead the police with false alibi evidence.

The police engaged in no actions that could be remotely characterized as coercive. The interviews were low key and nonconfrontational, appellant was *Mirandized* numerous times, and officers asked appellant several times if he would agree to continue the interviews. On July 16, when appellant asked to leave, the police communicated their readiness to accede to appellant's request. Appellant was provided with something to drink upon request and permitted to smoke. No threats or promises were made, there was no violence, and appellant did not suffer from physical illness during the interviews. There is also no evidence that appellant was isolated from his friends and family, and although

appellant did not actually consult an attorney, he was reminded numerous times that he was free to do so.

Moreover, appellant appeared to understand the questions. He individually acknowledged understanding each *Miranda* warning. The officers permitted appellant to initiate the topics for discussion during the early interviews, and later, the police questions were generally non-leading in nature.

As for the surveillance on July 9, the police had a number of valid reasons to conduct such surveillance. Appellant was being investigated for two murders. Moreover, the record shows that appellant had previously threatened the Wacker family, his own mother and stepfather, and two police officers. Finally, appellant's incident with the neighbor's children was logically viewed by the police as a possible attempted kidnapping.

Appellant argues that the police conduct was unduly suggestive because they pretended to be his friends. He relies upon the "false friend" scenario denounced in *Spano v. New York*, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959). But in that case, a police officer acquaintance falsely told the defendant that the officer was in trouble and that, if the defendant did not cooperate, the officer could lose his job and be unable to support his family. *Id.* The *Spano* scenario essentially involves a kind of implied threat to a person perceived by the suspect as a friend. That scenario is completely different from a situation in which the officers merely attempt to facilitate communication by being friendly and supportive. The present case is an example of the latter. The fact that a friendly, supportive, low key, nonconfrontational style may prove effective in eliciting incriminating statements does not mean that the style of questioning is improper or that the resulting statements are involuntary. Under the circumstances of the present case, we find appellant's confessions to be voluntary. Points of error one through six are overruled.

8. Appellant was formally arrested after the first recorded "Nancy" statement but before the second recorded "Nancy" statement. We express

### b. *Compliance with statute*

In point of error seven, appellant complains that he never received copies of the tape-recorded interviews concerning Nancy's murder in violation of Article 38.22 § 3(a)(5).[8] On July 14, 1993, appellant filed a motion to suppress, alleging in part that:

> The confessions described above should be suppressed because defense counsel has not been provided with true, complete, and accurate copies of all visual and/or audio recordings of Defendant, as dictated by statute.

On August 23, 1993, the trial court held a hearing on the admissibility of the confessions. The main subjects of the hearing were whether the confessions were voluntary and whether the interrogations complied with the requirements of Article 38.22. Whether defense counsel received copies was addressed only in the following colloquy:

> PROSECUTOR: The exhibits marked 6, 7, 8, and 9 are copies of the taped interviews. The originals are available if the Court wishes to inspect them or compare them, but at this time we are offering the copies into evidence, and we would so offer at this time.

> DEFENSE COUNSEL: Your Honor, we have never been able to inspect the originals to have an expert make a determination as to whether or not they have been altered in any way, if there are breaks in the tape, or an explanation for any breaks. We have been provided copies, and the State has told us those are accurate copies, but we don't have any experts to examine those.

> . . . .

> COURT: Objection overruled. Exhibit Nos. 6, 7, 8, and 9 will be admitted. The defense will have an opportunity to review the original.

> (State's Exhibits 6, 7, 8, and 9 were admitted).

> . . . .

no opinion about whether appellant was in "custody" during the first statement as it does not impact our resolution of his point of error.

PROSECUTOR: Your Honor, we will provide transcripts for the Court, so the Court can follow along with the tape.

(At this time, certain tapes entered as evidence were listened to in open court).

On February 9, 1994, during the trial on the merits, the trial court conducted a hearing to determine the admissibility of the taped confessions to Nancy's murder as extraneous offenses. At the hearing, defense counsel also objected that the "Nancy" confessions were inadmissible because he had not received copies of the tapes.[9] He contended that Article 38.22 § 3(a)(5) required the State to provide a true and accurate copy no later than twenty days before trial. Defense counsel requested and received an adverse ruling on the issue.

According to Article 38.22 § 3(a)(5), no oral statement of an accused made as a result of custodial interrogation is admissible unless:

> not later than the 20th day before the date of the proceeding, the attorney representing the defendant is provided with a true, complete, and accurate copy of all recordings of the defendant made under this article.

Although appellant acknowledges receiving transcripts of the "Nancy" tapes, he asserts that he has never received copies of the recordings (i.e. tapes). Implicit in this assertion is the idea that the transcripts themselves are not "copies" under § 3(a)(5). We have recently decided that transcripts do not constitute "copies" of recordings under the statute. *Tigner v. State*, 928 S.W.2d 540 (Tex.Crim.App.1996).[10]

But, copies of the recordings were admitted into evidence and played at the pretrial suppression hearing on August 23. The State argues that those copies were "provided" to defense counsel within the meaning of the statute. Appellant, on the other hand, argues that the copies were never provided because they were never *served* on defense counsel. We believe that appellant's position is too narrow.

In construing a statute, an appellate court must apply the plain meaning of its words unless the language of the statute is ambiguous or would lead to absurd results. *Boykin v. State*, 818 S.W.2d 782, 785–786 & 786 n. 4 (Tex.Crim.App.1991). But, when the words of a statute are ambiguous, we may look to extratextual factors to attempt to ascertain the statute's meaning. *Id.* Some of these factors include the:

(1) object sought to be attained;

(2) circumstances under which the statute was enacted;

(3) legislative history;

(4) common law or former statutory provisions, including laws on the same or similar subjects;

(5) consequences of a particular construction;

(6) administrative construction of the statute; and

(7) title (caption), preamble, and emergency provision.

Tex.Gov't.Code, § 311.023.[11]

We find that the word "provide" is capable of two meanings: (1) to make available; furnish, or (2) to supply or equip. *The Random House Dictionary of the English Language*, 2nd ed., Unabridged, 1556 (1987). As in the text of the statute, both definitions may be used in conjunction with the preposition "with." *Id.* If the first definition is

---

9. Defense counsel had received tapes of the "Bertha" confessions. Counsel's statement at the pre-trial hearing, "We have been provided copies ...," appears to have referred only to those, the "Bertha" tapes.

10. Although *Tigner* dealt with Article 38.22 § 3(a)(5), it does not control the disposition of appellant's claims. In *Tigner* the issues were whether a transcript constitutes a "copy," and whether voir dire is a "proceeding" within the meaning of the statute. *Tigner* does not address the meaning of "provide," because it was not an

issue in that case. Nothing in what we say today contradicts the holdings in *Tigner*.

11. This provision is part of the "Code Construction Act," which applies to the Code of Criminal Procedure, at least to the extent it has been amended or re-enacted by the 60th or subsequent legislature. Tex. Gov't Code § 311.002(2). *Postell v. State*, 693 S.W.2d 462, 464 (Tex.Crim.App. 1985). *Barbee v. State*, 432 S.W.2d 78, 82 (Tex. Crim.App.1968), *cert. denied*, 395 U.S. 924, 89 S.Ct. 1779, 23 L.Ed.2d 241 (1969).

correct, then the statute merely requires that defense counsel be given access to a copy of the recording. On the other hand, if the second definition is correct, then actual delivery may be required. Hence, the statute is ambiguous, and we must look to extratextual factors to determine its meaning.[12]

The relevant legislative history consists of remarks during the floor debate in the Senate. Some concern existed about amending the statute to permit surreptitious recording. To offset this concern, § 3(a)(5) was inserted in the bill to give defense counsel notice about the existence of a recording and enable him to test its accuracy:

> SENATOR WASHINGTON [sponsoring § 3(a)(5)]: Since this is a surreptitious recording where the defendant doesn't know about it, it requires that, twenty days prior to trial, that they give the other side a copy of any recordings they've made, which is to create a level playing field. So, if you're going to make the recording, give the guy's lawyer a copy of it, and you can

probably settle a lot of these cases if they know that.

. . . .

> UNKNOWN SENATOR: Your bill also provides that the defense attorney has accessibility to that tape in order for him to check it out on his own devices as to whether or not that oral confession warning has been prerecorded, and then the beatings take place, and then the young man confesses, or the young woman, or the old man, right?

> SENATOR BROWN [sponsoring amending legislation including § 3(a)(5)]: That's correct, senator.

> UNKNOWN SENATOR: And you can tell that through splicing, and you can tell that through "high tech. . . ."

Floor Debate, S.B. 55, 71st Leg., R.S., tape 2, side 3 (April 13, 1989). Senator Washington's use of the word "give" in explaining the provision tends to support appellant's interpretation, but the references to "accessibility" and "levelling the playing field" tend to

---

12. In his dissenting opinion, Judge Baird contends that we have performed an incorrect *Boykin* analysis by looking beyond the statutory language to a dictionary to determine whether a word is ambiguous. He apparently considers a dictionary definition of a word contained in the statutory text to be an "extratextual" source of information. However, we have held that use of dictionary definitions of words contained in the statutory langauge is part of the "plain meaning" analysis that an appellate court initially conducts to determine whether or not the statute in question is ambiguous. *Bingham v. State,* 913 S.W.2d 208, 209–210 (Tex.Crim.App.1995). Contrary to his current opinion, Judge Baird has recently recognized, in a dissenting opinion, that dictionary definitions may be validly used to determine the plain meaning of statutory language. *Moosani v. State,* 914 S.W.2d 569, 573–574 (Tex. Crim.App.1995) (Baird J. dissenting). Judge Baird accuses us of misreading that dissent. But, the *Moosani* dissent engaged in the same kind of analysis that Judge Baird faults in our opinion today: the opinion first explored the differing dictionary definitions for "travel," and *subsequently* concluded that the statutory language in question was ambiguous. Only *after* this conclusion did Judge Baird refer to the century-old case in which we held the word "traveling" to be ambiguous. Further, in the *concluding* sentence of the section in which Judge Baird discussed the dictionary definitions, the *Moosani* dissent stated that: "Because the term traveling is ambiguous, we may look to extra-textual factors such as our prior decisions and the Legisla-

ture's subsequent approval of those decisions." The following section discussed prior decisions and the absence of change in the statute. Hence, despite his protestations to the contrary, Judge Baird's opinion in *Moosani* clearly considered the examination of competing definitions as part of a plain meaning analysis, which was followed by an analysis of the extratextual factor of prior court precedent.

Judge Baird also argues that using dictionary definitions as part of a plain meaning analysis would result in judicial rewriting of statutes because "virtually every word in the English language has more than one definition." This view mistakenly presumes that dictionary definitions are the *only* tools with which to conduct a plain meaning analysis. In addition to definitions, a plain meaning analysis must include reading words and phrases in context and construing them in accordance with the rules of grammar and common usage. *See Bingham,* 913 S.W.2d at 209–210 (citing Tex. Gov't Code § 311.011(a)). In the present case, the rules of grammar and common usage simply do not shed any light on the proper definition of "provide."

Moreover, the position Judge Baird advocates today is logically untenable. His view would result in assessing the plain meaning of statutory language in a vacuum, resulting in an "I cannot explain it, but I know it when I see it" approach. Such an approach would relegate plain meaning analysis of statutory language to the subjective impression of appellate judges with no standards to guide interpretation.

support the State's argument that copies need only be "made available" to defense counsel.[13] Because the legislative history is not conclusive, we must turn to other extratextual factors.

Nothing in the title, preamble, or emergency provision appears relevant to the inquiry before us. There are no former statutory provisions or common law relevant to this situation. Primarily then, we must attempt to ascertain the object sought by the provision and the consequences of a particular construction. *See Burgess v. State,* 816 S.W.2d 424, 430 (Tex.Crim.App.1991). The object of the provision appears to be bound with the circumstances surrounding its enactment: § 3(a)(5) was designed to offset the disadvantages to the defense caused by permitting recordings to be surreptitious. Affording defense counsel access to the recordings effectuates this purpose as much as requiring actual delivery. So long as defense counsel is informed of the existence of the recording and permitted reasonable access to a copy, the purpose of § 3(a)(5) has been met. Requiring actual delivery would have the adverse consequence of excluding evidence that is both relevant and legally obtained where the defense has suffered no harm but has had the opportunity to evaluate and test the evidence. If the legislature had intended to require actual delivery, they could have used the word "served," "given," or "delivered" instead of "provide." Given the object sought by the statute and the consequences of the differing constructions, we hold that the word "provide" in § 3(a)(5) means to "make available or furnish."

▮▮ In the present case, the tapes were played at a pre-trial hearing and admitted into evidence. Under Article 2.21(a),[14] exhibits admitted into evidence are filed with the district clerk. Tex.Atty.Gen.Op. MW–71 (October 17, 1979). In this case, defense counsel was placed on notice of the existence and contents of the recordings, and the recordings were available to him in the district clerk's office. He was thus provided with a copy of the tape.

▮▮ While we have determined that defense counsel was provided with a copy, the question remains whether he was provided the copy twenty days before the "proceeding." Because appellant argues that the tapes were never provided, he never explains whether the applicable proceeding is the pretrial hearing or the trial on the merits. If appellant was first provided a copy of the recordings at the pretrial hearing, then obviously, he could not have been provided a copy twenty days before that hearing. However, we find that any complaint regarding the pretrial hearing was waived. Although appellant alleged that he had not been provided copies in his motion to suppress, this motion was filed more than twenty days before the pretrial hearing. Hence, even if the allegations in the motion were true, it is possible that the objection could have been remedied more than twenty days before the hearing. It was incumbent upon appellant, therefore, to object at the pretrial hearing to the State's failure to comply with the statute. Tex.R.App.P. 52(a). *See McNairy v. State,* 835 S.W.2d 101, 107–108 (Tex.Crim.App. 1991); *Wilson v. State,* 857 S.W.2d 90, 94 (Tex.App.—Corpus Christi 1993, pet. ref'd). He did not do so. If he had, he may have been entitled to a twenty-day continuance of the hearing to examine copies of the recordings. In the present case, however, defense counsel stated that he had copies of the recordings but wanted to examine the originals. Hence, the trial court was not placed on notice at the pretrial hearing that defense

---

**13.** The dissent adds its own emphasis to Senator Washington's statement, and attaches supreme and definitive meaning to the word "give." But "give" is not the critical word in the statement; "know" is. The focus of Senator Washington's comment is "if they know that." If physical possession of a tape, rather than knowledge of the statement, were the crux of the senator's statement, he would have said "if they *have* that." The point is that the dissent takes one word, focuses on it to the exclusion of the rest of the statement, and then declares that so doing

makes the statement unambiguous. Of course it does, but it is neither helpful nor accurate to do so.

**14.** The provision states:

Each clerk of the district or county court shall receive and file all papers and exhibits in respect to criminal proceedings, issue all process in such cases, and perform all other duties imposed upon them by law.

counsel did not possess copies of the recordings.

■ Although defense counsel clearly objected at trial, because the pretrial hearing occurred more than four months before trial began, providing the tapes at the pretrial hearing satisfied the statutory requirement as far as the trial proceeding was concerned. Point of error seven is overruled.[15]

### c. *Extraneous offense*

In points of error eight and nine, appellant complains that the confessions relating to Nancy's murder constituted inadmissible evidence of an extraneous offense. In point of error eight, he argues that the evidence was *not relevant to any non-character-conformity purpose under Rule 404(b).*[16] In point of error nine, he claims that the prejudicial effect of the evidence substantially out-

weighed its probative value under Rule 403.[17] The State argues that the evidence was very relevant to the issues of identity, motive, and the rebuttal of various defenses.

We believe that the trial court did not abuse its discretion in overruling appellant's objections.[18] After addressing the factual background, we turn to appellant's points in the order presented.

### (1) *Factual background*

The trial court conducted a hearing to address appellant's extraneous offense objections. At this hearing and on appeal, the State argued that the "Nancy" confessions were relevant to identity because the Bertha and Nancy murders were extremely similar. To support its argument, the State offered a chart outlining the similarities between the two cases:

| BERTHA MARTINEZ CASE | NANCY SHOEMAKER CASE |
|---|---|
| VICTIM PROFILE | VICTIM PROFILE |
| — One (1) Victim | — One (1) Victim |
| — Female Victim | — Female Victim |
| — Child Victim | — Child Victim |
| — Same Approx. Age (8 yrs old) | — Same Approx. Age (9 yrs old) |
| — Victim was "Unknown Stranger" | — Victim was "Unknown Stranger" |
| KIDNAPPING | KIDNAPPING |
| — Victim was Abducted | — Victim was Abducted |
| — Victim was Abducted/Public Area | — Victim was Abducted/Public Area |
| — Victim was Abducted Near Victim's Home | — Victim was Abducted Near Victim's Home |

15. As an alternative method of affirming the trial court's judgment, Judge Baird contends that any error is harmless because "appellant was aware of the statement and its contents" and there was no evidence that the statement was inaccurate. Judge Baird's proposed harm analysis flies in the face of the holding in *Tigner v. State*, 928 S.W.2d 540, 545–546 (Tex.Crim.App.1996). In *Tigner*, we held that Article 38.22 § 3(a)(5) is a statute regarding the *admissibility* of evidence and that a harm analysis must focus on the effect of the erroneously admitted evidence on the trial rather than on whether the defendant was ambushed or surprised by the state's failure to give the required notice. *Id.* The analysis proposed by Judge Baird is more appropriately directed to *interpreting* a facially ambiguous statute as we have done in the present case. See *id.* at 546.

16. All references to rules are to the Texas Rules of Criminal Evidence. Rule 404(b) provides in relevant part:

Evidence of other crimes, wrongs, or acts is not admissible to prove character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...."

17. Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

18. We express no opinion concerning the issue of motive.

— Victim was Physically Relocated ( . . . City Park/ Commanche St. Residence)

— Victim was Physically Relocated ( . . . Bell Plaine, Kansas)

**DEFENDANT HAD "NEXUS" TO LOCATION OF ABDUCTION**

— Defendant was Resident of Nearby Brown School

**DEFENDANT HAD "NEXUS" TO LOCATION OF ABDUCTION**

— Defendant Delivered "Penny Power" Circulars in this area

**VICTIM WAS PHYSICALLY ASSAULTED**

**VICTIM WAS PHYSICALLY ASSAULTED**

**VICTIM WAS SEXUALLY ASSAULTED**

**VICTIM WAS SEXUALLY ASSAULTED**

**VICTIM WAS MURDERED**

— Defendant "strangled" victim

**VICTIM WAS MURDERED**

— Defendant "strangled" victim

**VICTIM'S BODY WAS "DUMPED"**

**VICTIM'S BODY WAS "DUMPED"**

**DEFENDANT COMMITTED OFFENSE WITH CO-ACTOR**

— Woody and Murlene Broughton

**DEFENDANT COMMITTED OFFENSE WITH CO-ACTOR**

— Donny Wacker

**DEFENDANT INVOLVED WITH "SEARCH"**

**DEFENDANT INVOLVED WITH "SEARCH"**

**DEFENDANT CLAIMED "TROPHY" FROM CRIME**

— Wore Bertha Martinez's Underwear

**DEFENDANT CLAIMED "TROPHY" FROM CRIME**

— Took Nancy Shoemaker's Underwear

---

The State argued that the extraneous offense was critical on the issue of identity because there was no physical evidence to connect appellant to the offense, and some of the physical evidence could arguably indicate to the contrary. On direct examination, the State's DNA expert testified that the DNA test was inconclusive. On cross-examination, the expert admitted that one possible interpretation of the test was that appellant was *excluded* from being the perpetrator.[19] The State explained that it had no eyewitness testimony and that the only evidence linking appellant to Bertha's murder was his own confession. The State further argued that the confession's accuracy was under attack. The trial court could also have recalled that appellant had attacked the voluntariness of the confession at an earlier pretrial hearing. Finally, the State argued that the "Nancy" confessions showed appellant's motive for committing Bertha's murder—his obsession with collecting girl's panties.

The trial court overruled appellant's objections and made written findings of fact and conclusions of law. The court found the extraneous offense evidence to be "highly probative" on the issues of identity, motive, and the rebuttal of potential defenses. The trial court specifically found a high degree of similarity between the Nancy and Bertha murders; it attached the State's chart as an exhibit. The court found that the probative value of the evidence substantially outweighed its prejudicial effects and made several factfindings relevant to that determination. Among those findings, the court held that the State's need for the evidence was substantial because

> the main evidence implicating the defendant is his statement(s) which he now seeks to recant and attack and [there is an] otherwise total "void" of any other forms of traditional testimony and evi-

19. Long before the introduction of the Nancy confessions, the defense placed the trial court on notice that they intended to introduce testimony through their own expert that the DNA evidence excluded appellant.

dence used to establish the issue of identity of the perpetrator of a crime.

### (2) *Rule 404(b)—relevant purposes*

■■■ We review the trial court's determination of admissibility for purposes other than character conformity under an abuse of discretion standard. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App.1990). Identity and the rebuttal of defenses are both valid purposes for admitting evidence under Rule 404(b). *Id.* at 388.

■■■ An extraneous offense may be admissible to show identity only when identity is an issue in the case. *Moore v. State*, 700 S.W.2d 193, 201 (Tex.Crim.App.1985), *cert. denied,* 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 289 (1986). The issue of identity may be raised by the defendant during cross-examination of the State's witnesses. *Id.* at 199. *Siqueiros v. State*, 685 S.W.2d 68, 71 (Tex.Crim.App.1985). *Walker v. State*, 588 S.W.2d 920, 922 (Tex.Crim.App.1979). For instance, the issue of identity is raised when the state's only identifying witness is impeached by cross-examination concerning a material detail of the witness' identification. *Siqueiros*, 685 S.W.2d at 71.

■■■ In the present case, the issue of identity was raised during cross-examination when defense counsel attacked the accuracy of appellant's confessions. It was also clear from a pretrial hearing that the voluntariness of the confessions would be an issue. Because appellant admitted to being the perpetrator in his confessions, the defense strategy involved depicting the confessions as untrue either because they contained obvious factual inaccuracies or because the confessions were the result of undue influence by the police. The issue of identity was also raised by the evidence that the DNA test results could be interpreted as excluding appellant.

■■■ Raising the issue of identity does not automatically render extraneous offenses admissible. To be admissible to show identity, an extraneous offense must be so similar to the offense charged that the offenses are marked as the accused's handiwork. *Bishop v. State*, 869 S.W.2d 342, 346 (Tex.Crim.App. 1993). In *Walker*, we held the offenses to be

sufficiently similar, where they possessed the following similar characteristics: (1) the offenses occurred at night, (2) they occurred in the same area, (3) they occurred within a period of one month, (4) the defendant was alone, (5) the defendant carried a small gun, (6) the victims were tied in a similar manner, (6) the robbery preceded the rape, and (7) all coins but pennies were taken from the victims. 588 S.W.2d at 924. Likewise, in *Ransom v. State*, 503 S.W.2d 810 (Tex.Crim.App. 1974), we held offenses to be sufficiently similar when: (1) both offenses were robberies, (2) both offenses were committed at gunpoint, (3) the defendant was aided by a confederate, and (4) the offenses occurred three days apart. *Id.* at 813. We explained that sufficient similarity may be shown by proximity in time and place *or* by a common mode of committing the offenses. *Id.* (emphasis in original).

■■■ In the present case, the time and place of the offenses were not in close proximity. The offenses occurred a decade apart in different states. But, the mode of committing the offenses and the circumstances surrounding the offenses are sufficiently similar for the extraneous offense to be relevant to the issue of identity. Those similarities are accurately addressed in the State's chart depicted above, and we need not repeat them here.

Moreover, because the "Bertha" confessions were the State's only direct evidence of identity, the issue of identity is intertwined with issues concerning the accuracy and voluntariness of appellant's statements. While the crimes were very similar, numerous small details were given in appellant's "Nancy" confessions concerning where Nancy's murder took place, what materials were used to commit the crime, and other circumstances surrounding the offense. These details necessarily differed from those relating to Bertha's murder, but, because only skeletal remains of Nancy's body were found, the police could have no knowledge of these details. A jury could have viewed the difference and depth of the details as evidence that the statements regarding Bertha's and Nancy's murders reflected appellant's knowledge of

the crimes rather information supplied by the police.

Further, appellant's confessions lead the police to Donny Wacker, appellant's accomplice in Nancy's murder, whose involvement had previously been unknown. Wacker confirmed that he and appellant were involved in Nancy's murder. The jury could have believed that appellant's naming Wacker as an accomplice constituted information that was subsequently verified. And, because the Bertha and Nancy confessions were obtained during the same time period, this verification of information relating to the "Nancy" confessions may have increased the likelihood that admissions contained in the Bertha confession were a product of appellant's own knowledge rather than police misconduct.[20]

Moreover, the defense attack upon the accuracy of the confessions was not limited to the question of voluntariness. Wacker's admitted accomplice status may have caused the jury to view appellant's "Nancy" confessions as having more inherent reliability than the "Bertha" confessions. If so, the jury could have used the extraneous offense, of which they had greater confidence, as circumstantial evidence of identity.

Because the "Nancy" confessions were relevant to the issue of identity and to rebut appellant's claim that his "Bertha" confessions were inaccurate and involuntary, the "Nancy" confessions were admissible under Rule 404(b). Point of error eight is overruled.

### (3) *Rule 403—prejudice v. probative value*

■■■■ In determining whether the prejudicial effect of evidence substantially outweighs its probative value, several factors should be considered:

(1) How compellingly evidence of the extraneous misconduct serves to make more or less probable a fact of consequence,

(2) The potential the "other crime, wrong, or act" has to impress the jury in some irrational but indelible way,

(3) How much trial time does the proponent need to develop evidence of the extraneous misconduct, and

(4) How great is the proponent's need for the extraneous transaction.

*Montgomery,* 810 S.W.2d at 389–390. The trial court's ruling must be upheld so long as it was "within the zone of reasonable disagreement." *Id.* at 391.

■■■ Given the striking similarities between the two offenses, we agree with the trial court that Nancy's murder was highly relevant to the issue of identity. We also believe that the "Nancy" confessions had a strong tendency to rebut appellant's attacks on the voluntariness and accuracy of the "Bertha" confessions. That the offenses occurred a decade apart is a factor to consider when assessing the probative value of the evidence, but even taking that factor into account, we find that the probative value of the evidence was strong.

As for the potential to irrationally impress the jury, it is true that an extremely similar extraneous offense always carries the potential to impress the jury of a defendant's character conformity, an impression the law seeks to avoid. However, the impermissible inference of character conformity can be minimized through a limiting instruction. *See Id.* at 393. We do not perceive any reason a limiting instruction would be any less effective in the present case than in other cases in which identity is an issue.[21]

As for the amount of trial time needed to develop the evidence, the extraneous offense constituted less then one-fifth of the testimony in the State's case-in-chief (less than one day out of five days of testimony). We do not believe that this amount of time was excessive.

Finally, the State's need for the evidence was very strong. Appellant's confessions constituted the *only* evidence connecting him

---

20. In accordance with Article 38.22 § 7, the jury charge contained an instruction to disregard any involuntary statements made by appellant.

21. The guilt/innocence jury charge included an instruction limiting the jury's consideration of extraneous offenses to the issues of identity, motive, and rebuttal of defensive theories.

to Bertha's murder. Appellant attacked the confessions as being involuntary and inaccurate. Appellant also challenged identity by showing that the DNA test results could be interpreted as excluding him from being the perpetrator. Hence, identity was a hotly contested issue, and the integrity of appellant's "Bertha" confessions was of critical importance to the State.

Under these circumstances, we believe that the trial court was within the zone of reasonable disagreement when it concluded that the probative value of the extraneous offense was not substantially outweighed by its prejudicial impact. Point of error nine is overruled.

The judgment of the trial court is AFFIRMED.

MALONEY and MEYERS, JJ. concur in point of error seven and otherwise join this opinion.

CLINTON and OVERSTREET, JJ. dissent.

MANSFIELD, Justice, concurring.

I join the opinion of the Court. I write separately, however, to discuss point of error number seven as it relates to *Tigner v. State*, 928 S.W.2d 540 (Tex.Crim.App.1996).

In *Tigner*, we examined Article 38.22, § 3(a)(5) of the Texas Code of Criminal Procedure as it pertained to an electronically-recorded custodial statement of an accused. We specifically probed the meaning of two terms, "copy" and "proceeding," as those terms were used in Article 38.22, § 3(a)(5). Today, in analyzing point of error number seven, we probe the meaning of the word "provide" as used in that statute. Our opinion today is consistent with the holding in *Tigner* because the inquiries in each case were different. In *Tigner*, it was clear that the State did "provide" something to the defendant. The issue there was simply whether that "something" constituted a "copy" for the purpose of Article 38.22, § 3(a)(5).

I join the opinion of the Court today both because I agree with the majority's interpretation of the term "provide," and because that interpretation is consistent with *Tigner v. State.*

BAIRD, Justice, dissenting.

The seventh point of error contends the trial judge erred in admitting appellant's electronically recorded oral statement. Specifically, appellant contends the statement was not admissible because he was not provided with a copy of the statement. Tex. Code Crim.Proc. art. 38.22, § 3(a)(5) provides:

> Sec. 3(a) No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:
>
> * * * * * *
>
> (5) not later than the 20th day before the date of the proceeding, the attorney representing the defendant is *provided* with a true, complete, and accurate copy of all recordings of the defendant made under this article.[1]

After a protracted analysis, the plurality ultimately holds the Legislature's use of the word *provide* is ambiguous. *Ante,* 933 S.W.2d at 514. Relying upon *Boykin v. State,* 818 S.W.2d 782 (Tex.Cr.App.1991), the plurality looks to extratextual sources and concludes art. 38.22, § 3(a)(5) is satisfied so long as the statement was *available* to appellant. *Ante,* 933 S.W.2d at 514. I cannot agree.

In *Boykin,* we recognized our constitutional function to effectuate the collective intent or purpose of the legislators who enacted the legislation in question. *Id.,* 818 S.W.2d at 785 (*citing, Camacho v. State,* 765 S.W.2d 431 (Tex.Cr.App.1989)). To effectuate their intent, we apply the literal text of the statute. We do so because it is the only definitive evidence of what the legislators had in mind when the statute was enacted. *Boykin,* 818 S.W.2d at 785. And, because the "Legislature is *constitutionally entitled* to expect that the Judiciary will faithfully follow the specific text that was adopted." *Ibid.* Only

[1]. All emphasis is supplied unless otherwise indicated.

when the literal text would lead to absurd results, or when the text is not plain but ambiguous, is it constitutionally permissible for a court to consider extratextual factors. *Id.,* 818 S.W.2d at 785–786.

In my opinion, no person of ordinary and common intelligence reading art. 38.22, § 3(a)(5) would find "provide" to be ambiguous. Indeed, only after looking beyond the statute to *The Random House Dictionary of the English Language* does the plurality find support for its conclusion that "provide" is capable of two meanings. *Id.,* 933 S.W.2d at 514. By beginning its analysis by searching for an ambiguity, the plurality performs an incorrect *Boykin* analysis.[2] The plurality's approach is untenable because virtually every word in the English language has more than one definition. In other words, if the judiciary is looking for an ambiguity, it need look no further than a dictionary. And once such an ambiguity is found, the judiciary is free to rewrite the statute using its preferred definition even when the record is clear the Legislature did not intend such an interpretation.

In the instant case, the Legislature, in using "provide," intended for the defendant to be *given* a copy of the statement. Senator Washington, who sponsored this statute, stated on the Senate Floor:

> ... [The Statute] requires that, twenty days prior to trial, that [the State] *give* the other side a copy of any recordings they made, which is to create a level playing field. So, if you're going to make the recording, *give* the guy's lawyer a copy of it, and you can probably settle a lot of these cases if they know that.

The plurality concedes this statement supports appellant's argument, but concludes the statement is "not conclusive" on this issue of whether the Legislature used "provide" to mean "give" (as is suggested by Senator Washington), or "make available." *Ante,* 933 S.W.2d at 514.

The plurality's holding is contradicted by binding precedent. In *Dillehey v. State,* 815 S.W.2d 623 (Tex.Cr.App.1991), we relied on excerpts from the Senate Floor discussions to determine whether a defendant could appeal from a deferred adjudication probation. In relying on that extratextual source the Court noted: "we have long honored, as binding evidence of legislative intent ... floor debate." *Id.,* 815 S.W.2d at 625 (citing *Studer v. State,* 799 S.W.2d 263, 269–270 (Tex.Cr.App.1990)). Following our discussion of the floor debate, we stated: "Where intent is clear, there is no room for further construction." *Dillehey,* 815 S.W.2d at 625. In light of *Dillehey,* "provide" means what Senator Washington said it meant: to give. Most notably, we relied on floor debate when we were last called upon to interpret this statute. *Tigner v. State,* 928 S.W.2d 540, 541 (Tex.Cr.App.1996) (Relying on floor debate to determine what the Legislature meant by the term "copy."). The plurality provides no principled reason to ignore our precedent or the method previously employed to interpret this statute. In light of this controlling authority, we should hold that under art. 38.22, § 3(a)(5) the State was required to *give* appellant a copy of his electronically recorded oral statement. Because the plurality does not so hold, I dissent.

---

**2.** The plurality contends I took the same approach in *Moosani v. State,* 914 S.W.2d 569 (Tex.Cr.App.1995) (Baird, J., dissenting). *Ante,* at 515, n. 12. The plurality's argument evinces a careless reading of my dissent. I resorted to the dictionary because, as we noted a century ago in *Bain v. State,* 38 Tex.Crim. 635, 44 S.W. 518 (App.1898), "traveling" is ambiguous.