**Jimmy Ray SHORES, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 06–00–00061–CR.**

Court of Appeals of Texas, Texarkana.

Submitted Aug. 2, 2001.

Decided Aug. 3, 2001.

Steven R. Miears, Telephone, TX, for appellant.

James S. Moss, Special Assistant County Attorney, Bonham, TX, for state.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

Opinion by Chief Justice CORNELIUS.

Jimmy Ray Shores, Jr. was convicted by a jury of engaging in organized criminal activity. The jury assessed his punishment at five years' confinement. Shores challenges the legal and factual sufficiency of the evidence.

■ In reviewing the legal sufficiency of the evidence, we look to see whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560, 573 (1979); *Lane v. State,* 933 S.W.2d 504, 507 (Tex.Crim.App.1996). We evaluate all of the evidence in the record, both direct and circumstantial, whether admissible or inadmissible. *Johnson v. State,* 871 S.W.2d 183, 186 (Tex. Crim.App.1993).

■ Under a factual sufficiency analysis, we examine whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by con-

trary proof. *Johnson v. State*, 23 S.W.3d 1, 9 (Tex.Crim.App.2000); *see also Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim. App.1996). Accordingly, we will reverse the fact finder's determination only to "arrest the occurrence of a manifest injustice." *Johnson v. State*, 23 S.W.3d at 12. Otherwise, we give due deference to the fact finder's determinations concerning the weight and credibility of the evidence.

In order to convict Shores, the State was required to prove the allegations of the indictment, which were that Shores engaged in organized criminal activity by intentionally or knowingly manufacturing methamphetamine in an amount greater than or equal to four grams, but less than 200 grams, with the intent to maintain or participate in a combination or in the profits of a combination. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112 (Vernon Supp. 2001); *see also* TEX. PEN.CODE ANN. § 71.02(a)(5) (Vernon Supp.2001). A combination means three or more persons who collaborate in criminal activities, even though the participants may not know the others' identities, the membership may change from time to time, and the participants may stand in a wholesale-retailer or other arm's-length relationship in illicit distribution operations. TEX. PEN.CODE ANN. § 71.01(a) (Vernon Supp.2001).

The evidence showed that Shores, Larry Manry, Timothy Crawford, and two others gathered at Manry's rental home over the weekend of June 11, 1999 through June 13, 1999, to "cook" methamphetamine. Crawford testified that he arrived at Manry's house about midnight on June 11 and found Shores, Manry, and the other two men there. Early in the morning on June 12, they began the cook, finishing about six o'clock in the morning. Crawford testified that the completed cook yielded approximately eighty or ninety grams of metham-

phetamine. He testified that, per his agreement with Manry, he took half and Manry took half.

Crawford testified there was no other methamphetamine cook that weekend. He said that he left Manry's on Saturday and went to Sherman, but returned later that evening. Crawford testified that when he returned, Shores and Manry were there and the three of them stayed at Manry's until Sunday morning. On Sunday morning, Crawford went back to Sherman, but returned at noon. Manry and Shores were there when he returned, but Manry left later that afternoon.

Police raided the home Sunday afternoon after Manry left. David Thompson, an agent for the Regional Drug Task Force, testified that on the Sunday morning of June 13, a private citizen alerted police to the odor of chemicals emanating from Manry's home. Thompson testified that he went to a neighboring home and was able to smell anhydrous ammonia and denatured alcohol, two chemicals commonly used in the manufacture of methamphetamine, coming from Manry's home. From their observation of the property, police developed sufficient probable cause to obtain a search warrant that afternoon.

Inside the house, police discovered numerous items, which Thompson testified were used to manufacture methamphetamine. The items included: (1) six boxes of pseudoephedrine tablets, from which the ephedrine is extracted during the manufacturing process; (2) "pill dough," which is the hazardous, starch by-product remaining after the ephedrine is removed from the pseudoephedrine tablets; (3) lithium batteries, the lithium from which is extracted and used to react with the ephedrine and anhydrous ammonia to make the methamphetamine; (4) bottles of automo-

bile starter fluid,[1] which is used in the advanced stage of the manufacturing process; (5) a plastic bottle of toilet bowl cleaner and some window cleaner, both of which contain sulfuric acid used to make hydrochloric gas; (6) five cardboard containers of iodized rock salt, which is mixed with sulfuric acid to make hydrochloric acid gas; (7) pump sprayers, which are used for spraying hydrochloric acid gas on liquid methamphetamine to convert it into powder form; (8) a box of coffee filters, used to dry the powder methamphetamine; (9) pipes and tinfoil, that are used to smoke methamphetamine; (10) a digital scale, often used to weigh drugs; (11) a book titled "Uncle Festers [sic] Secrets of Methamphetamine Manufacturing," which was found in Shores' car; and (12) approximately thirty-eight grams of methamphetamine. In addition, Thompson testified that police discovered an active cook on the back porch.

■ Shores cites *Nguyen v. State*, 1 S.W.3d 694, 696–97 (Tex.Crim.App.1999), which held that members of a criminal combination must collaborate to commit more than a single crime, though the members may have actually committed only a single offense. The court in *Nguyen* also held that the critical element in establishing a criminal combination is continuity, i.e., that three or more people agreed to work together in a continuing course of criminal activity and that the acts that prove continuity need not be criminal offenses themselves, but may be preparatory acts in furtherance of the combination.

Shores admits the evidence shows he participated in the manufacture of methamphetamine, but he contends the evidence is insufficient to show he engaged in a criminal combination. Specifically, he contends the evidence shows that Manry, Crawford, and he gathered to commit only one offense: the manufacture of methamphetamine.

Reviewing the evidence in the light most favorable to the verdict, we conclude that the evidence is legally sufficient to show a continuing course of criminal activity. A rational jury could have concluded, based on Crawford's testimony, that the three men manufactured approximately eighty or ninety grams of methamphetamine between midnight on Friday, June 11 and six a.m. on Saturday, June 12.

The jury could also have rationally concluded, based on Thompson's testimony, that the three men were also engaged in the manufacture of methamphetamine on Sunday, June 13 when police raided the house. Thompson testified he could smell denatured alcohol and anhydrous ammonia emanating from Manry's house. He testified there was an active cook occurring on the back porch, and that there was pill dough dumped in the yard by the fence, which is evidence of a prior cook.

Further, the jury could have rationally concluded that the three men intended to manufacture more methamphetamine because Thompson testified that police seized raw materials such as pseudoephedrine tablets, lithium batteries, and starter fluid. Finally, the jury could have rationally inferred that Shores intended to participate in these activities, because he was present in the house throughout the weekend, participated in the cook that occurred on Saturday morning, was present in the house when police discovered the active cook on

---

1. At one point, Thompson seemed to indicate that denatured alcohol was found with some empty starter fluid bottles in a truck parked in front of Manry's house. Subsequent testimony seems to indicate that only starter fluid was found in the truck. Thus, the record is unclear concerning whether police found empty containers of denatured alcohol in the house.

Sunday afternoon, and had a book in his car on manufacturing methamphetamine. These preparatory activities are sufficient to allow the jury to infer that the parties collaborated in the commission of another offense.

We also conclude the evidence is factually sufficient. Although it is true that Crawford testified the only cook that weekend occurred early Saturday morning, Thompson testified there was an active cook occurring when police raided the house Sunday afternoon. He also testified he could smell anhydrous ammonia and denatured alcohol from nearby. As the sole judge of the weight and credibility of the evidence, the jury was free to resolve this conflicting testimony against Shores. Their decision to do so is not so against the weight of the evidence as to be manifestly wrong and unjust.

The judgment is affirmed.