In The
Court of Appeals
For The
First District of Texas
____________
NO. 01-02-00321-CR
____________

DECARLOS MONTRAY GARRETT, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 338th District Court
Harris County, Texas
Trial Court Cause No. 870048




MEMORANDUM OPINION
           DeCarlos Montray Garrett, appellant, was charged by indictment with the offense of
aggravated robbery with a deadly weapon. Appellant entered a plea of not guilty. On
February 18, 2002, the jury found appellant guilty of aggravated robbery. On February 19,
2002, the jury assessed punishment at 45 years in the Texas Department of Criminal
Justice—Institutional Division.
           On February 21, 2001, after the jury verdict in this case, but before appellant was
sentenced, he was tried for another aggravated robbery in cause number 886344. See Garrett
v. State, 2003 WL 203556 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Appellant was
found guilty of that offense on February 26, 2002, and the jury assessed punishment at 99
years in the Texas Department of Criminal Justice—Institutional Division.


 Appellant was
sentenced in that case on March 1, 2002.
           On March 5, 2002, appellant was sentenced to 45 years in cause number 870048, to
begin when the sentence in cause number 886344 ceased to operate. Appellant now raises
two issues on appeal, of cause number 870048 claiming that the trial court abused its
discretion in entering a cumulation order and in admitting evidence of four extraneous
offenses during the guilt/innocence phase of trial. We affirm.
Discussion
Cumulation of Sentences
           In his first point of error, appellant claims that the trial court erred in entering a
cumulation order because the order was entered after the date that his sentence was
pronounced.
           Article 42.08 of the Texas Code of Criminal Procedure provides that, when a
defendant has been convicted in two or more cases, at the discretion of the trial court, “the
judgment in the second and subsequent conviction may either be that the sentence imposed
or suspended shall begin when the judgment and the sentence imposed or suspended in the
preceding conviction has ceased to operate, or that the sentence imposed or suspended shall
run concurrently with the other case or cases . . . .” Tex. Code Crim. Proc. Ann. art.
42.08(a) (Vernon Supp. 2003). Furthermore, if a trial court wants to stack a defendant’s
sentences so that they may run consecutively, the trial court must make such an order at the
time and place that sentence is orally pronounced. Ex parte Madding, 70 S.W.3d 131, 136
(Tex. Crim. App. 2002).
           In this case, the jury returned a punishment verdict of 45 years imprisonment on
February 19, 2002. On February 21, 2002, appellant was tried for another aggravated
robbery in cause number 886344. On February 26, 2002, the jury found appellant guilty of
that second offense and assessed punishment at 99 years confinement. On March 1, 2002,
appellant was sentenced in cause number 886344. On March 5, 2002, appellant was brought
before the court and, in accordance with the jury’s verdict, the court sentenced him to 45
years confinement in cause number 870048. The trial court then addressed the issue of the
State’s motion to cumulate sentences and, based on the aggravating factors involved in the
case, ordered appellant’s 45-year sentence in cause number 870048 to begin when his 99-year sentence in cause number 886344 had ceased to operate.
           Appellant first argues that his sentence in cause number 870048 began to run on
February 19, 2002, the date of the jury’s verdict. There is nothing in the record to support
appellant’s claim that he was sentenced on February 19, 2002. Appellant further argues that
it was error to order that his 45-year sentence begin on March 1, 2002. The judgment, 
sentence, and the addendum reflect that the trial court ordered the sentence in this case to
begin after appellant had served his sentence in cause number 886344. We hold that the trial
court did not abuse its discretion in cumulating the sentences. We, therefore, overrule
appellant’s first point of error.
Extraneous Offenses
           In his second point of error, appellant claims that the trial court erred in admitting
evidence of four extraneous offenses during the guilt/innocence phase of trial.
           Evidence of other crimes may be admissible for such purposes as proof or motive,
opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. 
Tex. R. Evid. 404(b). Proof of identity and rebuttal of defenses are both valid purposes for
admitting such evidence under Rule 404(b). Lane v. State, 933 S.W.2d 504, 519 (Tex. Crim.
App. 1996). Evidence of an extraneous offense may become admissible upon a showing by
the prosecution that the transaction is relevant to a material issue in the case and that the
relevancy value of the evidence outweighs its inflammatory or prejudicial potential. 
Poullard v. State, 833 S.W.2d 273, 276 (Tex. App.—Houston [1st Dist.] 1992, pet. ref’d). 
Merely raising the issue of identity does not, however, automatically render extraneous
offenses admissible. Lane, 933 S.W.2d at 519. In order to be admissible to show identity,
an extraneous offense must be so similar to the offense charged that the offenses are marked
as the accused’s handiwork. Id. Sufficient similarity may be demonstrated by proximity in
time and place or by a common mode of committing the offenses. Id.
           Evidence admitted for the purpose of proving identity must demonstrate a much
higher degree of similarity to the charged offense than extraneous acts offered for other
purposes, such as intent. Bishop v. State, 869 S.W.2d 342, 346 (Tex. Crim. App.1993). 
Without such similarity, the probative value of such evidence would be substantially
outweighed by its prejudicial effect. Id. To assess the probative value, if any, that
extraneous offense evidence has apart from its tendency to prove character conformity, we
are to look to (1) the availability of alternative sources of proof, and, more generally, the
State’s need for the evidence; (2) the closeness in time between the extraneous offense and
the charged offense; and (3) the similarities between the extraneous offense and the charged
offense. Kiser v. State, 893 S.W.2d 277, 281 (Tex. App.—Houston [1st Dist] 1995, pet.
ref’d). The third factor is the most important of the three factors. Id. Furthermore, sufficient
similarity may be demonstrated by proximity in time and place or by a common mode of
committing the offenses. Lane, 933 S.W.2d at 519.
           The Present Offense
           In this case, Faye Eason, a 66-year-old home-health-care nurse, was in Houston
overseeing the care of a patient of whom she had been taking care for 13 years. She was
staying at the Wellesley Inn & Suites on South Braeswood. Eason drove her car around to
the back of the hotel in order to park near her room. Eason approached the side entrance
carrying her suitcase, briefcase, some papers, and her purse.
           She testified that, before opening the door, she heard someone running behind her and,
as she turned around, appellant put a gun to her forehead and told her to get in a station
wagon that someone else was driving. She testified that she refused to get in the car and
struggled with appellant all the way back to the parking lot. During the struggle, appellant
struck her several times, and Eason fell and passed out when appellant attempted to choke
her.
           Eason testified that the next thing that she remembered was that she was on the floor
of the backseat. She struggled to get up from the floor, but appellant hit her to keep her
down. Appellant took her credit cards and asked her for the PIN numbers. After Eason told
appellant that she did not know them, he struck her several more times.
           Eason testified that they made several stops at ATMs and that the driver always got
out of the car. Eventually they stopped at a phone booth and dialed the number on the back
of the credit card and made Eason talk to someone to try and get her PIN number, but she
was unable to get that information. Appellant jerked Eason’s wedding band off her finger. 
Appellant was unable to get any money from the ATMs, but appellant and the driver took just
over $100 dollars from Eason.
           Appellant’s car eventually came to a stop, and appellant told her to get out. Eason
testified that she got out of the car and started walking towards a field. Eason testified that
she eventually heard the car drive past.
           Detective Robert Sherrouse with the Houston Police Department’s Robbery Division
was assigned to the case. Detective Sherrouse was able to obtain photographs from
surveillance footage and distribute them to the media. Detective Sherrouse got a tip through
Crime Stoppers that a person named Beerien Crouch was involved in the robbery. Crouch
turned himself in at the station and gave a statement admitting to his involvement in the
robbery. After talking with Crouch, Detective Sherrouse obtained an arrest warrant for
appellant.
           Detective Sherrouse put appellant in a live line-up with five other men. Eason
identified appellant and stated that she was 100% certain that he was the gunman during the
robbery. Eason viewed a second live line-up, in which she identified Crouch as the driver
of the station wagon involved in the robbery. Crouch testified for the State and implicated
appellant as the gunman in the aggravated robbery of Eason. 
           After the State rested, appellant proceeded with an alibi defense. Doris Garrett, of no
relation to appellant, testified that, on January 22, 2001, appellant went to the Shape
Community Center with her between 6:00 p.m. and 6:30 p.m. Garrett testified that, on
January 22, 2001, the day that the victim was robbed at gunpoint in this case, appellant was
with Garrett during the time of the robbery. Garrett testified that she distinctly remembered
that day because she had specifically scheduled a business meeting at the Shape Center for
that evening, which was the Monday after Martin Luther King’s birthday. She testified that
she had asked appellant to go with her to the Shape Center and was positive that appellant
was with her from 6:00 to 8:00 that evening. In response to appellant’s alibi defense, the
State introduced evidence of four additional aggravated robberies that appellant had
committed with Crouch.
 
 
           1. Edwin Seligman, office building on December 15, 2000
           On December 15, 2000, Edwin Seligman, a 66-year-old man involved in the real
estate business, left the office building where he worked off of the Katy Freeway between
6:00 p.m. and 6:30 p.m. As Seligman put his briefcase in his trunk, he felt a gun against the
back of his head. Appellant ordered Seligman at gunpoint to get into a compact, four-door
car and to lie on the floor.
           As they drove away from the office building, appellant kept jabbing the gun into
Seligman’s cheek while he kept his knee in Seligman’s back or hip area as Seligman lay on
the floor. Appellant demanded Seligman’s ring, watch, wallet, and any money he had on
him.
           Appellant took the credit cards and cash from Seligman’s wallet. Appellant demanded
to know the PIN number on his ATM card, and Seligman gave him a PIN number that he
thought was correct. They stopped at an ATM. The driver got out of the car and tried to
make a withdrawal, but learned that the PIN number was incorrect. Appellant put the gun
in Seligman’s mouth and told him that when, he pulled the gun out, Seligman had better
remember the PIN number. Seligman told appellant that he did not give him the wrong code
on purpose and if he returned to the parking lot of his office, he could retrieve the PIN
number from his briefcase. They drove back to the parking lot, and the driver got out and
retrieved the briefcase from the trunk of Seligman’s car. The driver could not open the
briefcase because of two combination locks, so he gave it to appellant. Appellant told
Seligman to open the briefcase, but it was too dark to see the numbers. Appellant let
Seligman up from the floor, and it was then that Seligman was able to get a good look at
appellant.
           Once Seligman had given appellant his PIN number, they drove around and made
more stops at ATMs, and at each stop, the driver got out to get the money, while appellant
remained in the back with Seligman. Appellant also took $500 dollars from Seligman’s
briefcase.
           Eventually the suspects drove Seligman to a dark, remote warehouse area and told him
to get out of the vehicle. Appellant told Seligman that he was going to push him out of the
car and he should then walk 10 steps with his hands up without looking. Seligman testified
that he was waiting for the bullet, but the men drove away. Seligman viewed a live line-up
at the police station and identified appellant as the gunman.
           2. Michael Lee, Crown Plaza Hotel on December 27, 2000
           On December 27, 2000, Michael Lee and his wife were passing through Houston on
their way to Miami, where he was starting advertising school. They stopped at the Holiday
Inn Crown Plaza off of the Northwest Freeway to spend the night.
           They arrived at the hotel about 10:30 p.m., and it was cool outside. Lee’s wife was
cold, so she grabbed her suitcase and hurried inside while Lee gathered their remaining
things from the trunk. As Lee was leaning into the trunk, he felt a hard hit on the back of his
head. Appellant told Lee to get in a station wagon, but he refused. Appellant continued to
hit Lee in the head with a handgun until appellant and Crouch were able to force Lee into a
station wagon. Appellant made Lee lie on the floor of the back seat.
           Appellant demanded to know Lee’s PIN number, and Lee complied. Appellant took
Lee’s fanny pack, which contained $900 in cash, as well as 40 travelers checks in $100
denominations. Appellant also took the cash from Lee’s pockets, his wedding ring, and his
watch. Lee testified that they made multiple stops at ATMs and withdrew about $1,000. Lee
testified that the driver always got out of the car when they stopped and that appellant stayed
in the back seat.
           Appellant eventually dropped Lee off in a park-like area, where Lee walked to one
of the houses and found someone to call the police. Lee later viewed a videotaped line-up
and made a tentative identification of appellant based on his appearance. However, Lee was
able to identify appellant’s voice.
           3. Robert Whitfield, Holiday Inn on January 10, 2001
           On January 10, 2001, Robert Whitfield, a 57-year-old Continental Airlines pilot, was
in Houston for a training seminar and staying at the Holiday Inn by the Intercontinental
Airport. That evening, he drove back from dinner and pulled into the parking lot through a
side-access entry around 7:30 p.m. Whitfield noticed an old station wagon just cruising
through the parking lot and found it odd that anybody would be out cruising a parking lot in
the rain.
           Whitfield parked his car, and the station wagon pulled into the spot next to him. 
Whitfield put some papers that he did not want to get wet into his black bag, got out of his
car, and headed toward the door, access card in hand. Just as Whitfield slid the access card
into the slot, appellant put a gun to the back of his head. Whitfield testified that appellant
grabbed the access card, almost knocking Whitfield’s head into the building.
           Appellant pushed Whitfield over the hood of the station wagon and demanded his
black bag. Whitfield testified that he refused to give up the bag because it had his passport
and his books. Appellant told Whitfield to put his bag down on the ground, but he refused. 
Then appellant told Whitfield to give him the bag, and he looked away from Whitfield
toward the car for a moment, as if looking for guidance. At this point, Whitfield took the
opportunity and ran. As Whitfield tried to make it to the hotel, appellant fired at least eight
shots. At one point, Whitfield held his bag in front of his chest and later pulled out a USA
Today with a bullet hole. Whitfield found the bullet lodged in a thick flight manual.
           Whitfield later viewed a videotaped line-up and was able to make only a tentative
identification because of the poor tape quality. Subsequently, Whitfield viewed a live line-up, during which he positively identified appellant as the person who had fired the eight shots
at him on January 10, 2001.
           4. Patrick Neubauer, AmeriSuites Hotel on February 13, 2001
           On February 13, 2001, Patrick Neubauer, a 38-year-old business man from Wisconsin,
was in Houston managing a project for Anheuser-Busch. He was staying at the AmeriSuites
Hotel near Hobby Airport. That evening, Neubauer stopped at a grocery store to pick up
some snacks after having worked the entire day. He then headed to his hotel.
           Sometime between 7:30 and 8:30 p.m., Neubauer pulled into the AmeriSuites parking
lot. Neubauer got his coat, bag of snacks, briefcase, and laptop computer bag out of the front
seat and noticed a station wagon driving slowly behind him on the wrong side of the parking
lot. When Neubauer turned to pick up the briefcase he had set down, the station wagon
blocked his path, and appellant got out of the car with a gun. Appellant immediately told
Neubauer to turn around, and appellant knocked everything that Neubauer was carrying out
of his hands. Appellant put his left arm around Neubauer’s neck and the gun in his ribs and
told him to empty his pockets. Appellant unclipped Neubauer’s cell phone from his hip and
took his computer bag and briefcase. Appellant took those things back to the station wagon,
but Neubauer was not in a position to get away.
           Appellant put the gun in his pocket and ordered Neubauer to get in the car because
they were going for a ride. Appellant started to push him toward the car, but Neubauer spun
around and told him he was not going for a ride. Appellant kept looking over toward the
hotel to see if anybody was watching. Appellant then took a swing at Neubauer, striking him
in the collar bone. Neubauer testified that, as he ducked, appellant’s punch spun him around. 
Realizing that he could get away, Neubauer ran toward the hotel. As Neubauer got to the
curb, appellant grabbed Neubauer’s shirt as he was turning the corner. The shirt ripped, and
appellant fell into some bushes. Neubauer was able to make it to the back door of the hotel
and knocked until someone let him inside.
           Neubauer testified that, when they were in the parking lot, he was able to get a good
look at appellant. Neubauer viewed a videotaped line-up and positively identified appellant
as the gunman in the February 13, 2001 aggravated robbery.
           Our review of the record shows that there are significant similarities between the
offense in this case and the four extraneous offenses. We hold that the trial court did not
abuse its discretion when it found sufficient similarities between the aggravated robbery of
Eason and the four extraneous offenses. We overrule appellant’s second point of error.
Conclusion
           We affirm the judgment of the trial court.
 
                                                                             Sam Nuchia
                                                                             Justice

Panel consists of Chief Justice Radack and Justices Nuchia and Hanks.
Do not publish. Tex. R. App. P. 47.2(b).