Affirmed and Memorandum Opinion filed March 10, 2009








Affirmed
and Memorandum Opinion filed March 10, 2009.

 

                                                                                                                                                            

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-08-00153-CR

____________

 

RONALD JAMES WILLIAMS, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 183rd
District Court

Harris County, Texas

Trial Court Cause No. 1019349

 



 

M E M O R A N D U M   O P I N I O N

Appellant
Ronald James Williams challenges his conviction for felony murder following a
jury trial.  The jury assessed punishment as confinement for 22 years. 
Appellant contends that the trial court erred in admitting evidence of an
extraneous offense.  We affirm.

Background








On March
2, 2005, Lederic Berry was at home with his two brothers, Bruce and Roger
Walker; his mother; his girlfriend, Tawana, and their young daughter; and three
friends, Terence Williams, Cedric Ross, and a man named Jarrell.  Bruce Walker,
Terence Williams, and Cedric Ross were playing video games in the adjoining
garage.

At
approximately 10:00 p.m., Tawana got a phone call from her friend, Erica
Baptiste.  After their conversation, Baptiste called back and spoke with
Berry.  Baptiste=s boyfriend, Kelton St. Cyr, got on the phone during this
conversation and began a heated conversation with Berry.

St. Cyr, Baptiste, and Baptiste=s baby arrived at
Berry=s residence about
30 minutes later.  When Berry walked outside, he and St. Cyr got into an
argument.  Bruce Walker, Terence Williams, and Cedric Ross opened the garage
door after hearing the argument.  St. Cyr Abacked down@ when he saw the
men in the garage.  St. Cyr then got into his car, joined by Baptiste, Tawana,
and the children.  As he left, St. Cyr yelled that he was a ACrip@ and promised to return.

Berry received another phone call later that evening from
Baptiste and St. Cyr, during which St. Cyr demanded that Berry meet him at a
nearby gas station to settle their argument.  Berry stayed at home.

Less than an hour later, Berry, while lying in bed, heard
two sets of gunshots with a short pause between them.  Berry ran into the
living room and saw Bruce Walker, Terence Williams, and Cedric Ross running in
from the garage.  Berry=s mother and Jarrell also were in the
living room.  No one in the house or garage saw who fired the shots.  The
garage door was closed at the time of the shooting and had no windows.

Cedric Ross collapsed in the living room from a gunshot
wound suffered as he was running in from the garage; he died shortly
thereafter.  An autopsy later revealed that Cedric Ross was killed by a single
bullet that pierced both lungs, his esophagus, and his heart.

Baptiste called Berry=s home again about
20 minutes after the shooting and asked what had happened.  Baptiste called
because she had been unable to reach St. Cyr on his cell phone.  Berry told
Baptiste that someone had been shot inside his house.








At trial, Berry testified consistent with the summary
above.  Berry also testified that appellant was not the man with whom he had
argued on the evening of March 2, 2005.  Bruce Walker=s and Terence
Williams=s testimony was consistent
with Berry=s testimony.  Bruce Walker also testified that
appellant was not the man whom he had seen arguing with Berry on the evening of
March 2, 2005.

A friend of St. Cyr=s named Christian
Timberlake testified that St. Cyr called him on March 2, 2005 and asked him to
come to St. Cyr=s house.  When Timberlake arrived at St.
Cyr=s house, St. Cyr said
that he had been Ajumped@ earlier in the
evening by some men at Berry=s house.  Timberlake testified that he and
others accompanied appellant and St. Cyr to Berry=s house because
St. Cyr feared returning there alone.

Timberlake testified that the group drove to Berry=s subdivision in
three cars owned by appellant, St. Cyr, and Greg Washington.  Timberlake drove
Washington=s car.  Once inside the subdivision, St. Cyr parked
his car and got into Washington=s car with Washington and Timberlake.  Appellant
continued driving his own car.

Timberlake testified that when the two remaining cars
arrived in front of Berry=s house, St. Cyr got out of Washington=s car and spoke to
appellant.  Timberlake heard St. Cyr say while holding a cell phone: AWell, if y=all not going to
come outside, I=m going to make you come outside.@  Timberlake
watched appellant pull in front of Berry=s driveway and
fire multiple shots out of the driver=s side window
before driving away.  St. Cyr ordered Timberlake to stop in front of Berry=s house, and then
St. Cyr fired multiple shots out of the rear driver=s side window
before the group left and returned St. Cyr to his car.  

While being questioned about witnessing appellant and St.
Cyr firing at Berry=s house, Timberlake stated, AI=ve seen people
shoot at the club before, but I never seen them shoot up a house.@  Appellant did
not object to this testimony.  Timberlake also testified that appellant
admitted firing shots at Berry=s house from appellant=s car.  








Timberlake testified that he told appellant=s counsel before
trial that appellant was elsewhere at the time of the shooting; Timberlake
asserted he had been pressured into fabricating that alibi by St. Cyr. 
Timberlake also testified that he told defense counsel and people in his
neighborhood that St. Cyr=s brother _ who owned a car
similar to appellant=s, and was known to have killed someone
before _ fired the shots
at Berry=s house on March
2, 2005.

Greg Washington also testified against appellant, and his
testimony about what happened on March 2, 2005 tracked that of Timberlake. 
Washington testified that two other men also were in appellant=s car during the
shooting.  Washington testified that appellant drove a Buick and Timberlake
drove Washington=s blue Oldsmobile Cutlass Sierra to Berry=s house.  When
asked about giving conflicting accounts to appellant=s counsel,
Washington denied having met with appellant=s counsel.    

Mark Aguilar testified that he lived seven blocks away from
Berry, and that he saw an unfamiliar four-door gray Lincoln Continental parked
in front of his house late on March 2, 2005.  Aguilar testified that he heard
gunshots that night; shortly thereafter, a maroon car similar to an older model
Oldsmobile turned down his street.  Aguilar further testified that two men got
out of that car and into the car parked in front of his house, at which point
both cars drove away.

The trial testimony also addressed a separate incident that
occurred after the shooting at Berry=s house.  Houston
Police Officer Dong Hoang testified about an incident that occurred at a
nightclub shortly after 2:00 a.m. on March 6, 2005.  Before Officer Hoang
testified, appellant objected to challenge the relevance and probative value of
testimony about the March 6, 2005 nightclub incident.  The trial court
overruled this objection.  Appellant then requested and was granted a running
objection on the same grounds.  The State admonished its witnesses to refrain
from mentioning that the March 6 nightclub incident involved a shooting during
the State=s case-in-chief, instead referring to the incident as
a Aweapons incident.@








Officer Hoang testified that he was responding to a
disturbance call on March 6, 2005 when the complainant in the disturbance
flagged him down and pointed out appellant=s car _ a four-door
maroon 1993 Buick _ while claiming appellant had a gun in his hand during
the disturbance.  Based on this disturbance, appellant=s vehicle was
stopped and searched.

During this traffic stop, Officer Hoang found a silver .380
handgun underneath the rear driver=s side seat
cushion and a box of ammunition for the handgun.  Anthony Manuel, who was
sitting in the back seat of appellant=s car during the
March 6 traffic stop, was charged with possession of the handgun.  Witness
Corrion Chatmon testified that he saw appellant at the same nightclub on March
6 with a silver gun in his hand similar to the .380 handgun found in appellant=s car.  No
testimony was offered at this point in the trial about any criminal charges
against appellant in connection with the March 6 nightclub incident.

Mike Lyons, a firearms examiner for the Houston Police
Department, testified that the bullet recovered from Cedric Ross=s body after the
March 2 shooting at Berry=s home was fired from the same silver .380
handgun recovered from appellant=s car during the
March 6 traffic stop. 

During the defense portion of the trial, appellant offered
alibi testimony from multiple witnesses.  Harry Nelson, Jr., testified that
appellant arrived at church on March 2, 2005 at approximately 7:30 p.m. and
left between 9:30 p.m. and 10:00 p.m.  Terrence Gore testified that appellant
picked him up from a recording studio between 9:30 p.m. and 10:00 p.m. on March
2, 2005 and spent more than an hour at Gore=s apartment
listening to music until appellant left at approximately 12:15 a.m.  Gore=s girlfriend _ who also is
appellant=s cousin _ testified that appellant was with
Gore during this time frame. 

Gore also testified he was at the meeting between appellant=s counsel and
Timberlake; that Washington also was at the meeting; and that Washington
maintained at the meeting that appellant was not involved in the March 2
shooting.








After the defense rested, the State sought to proffer
additional evidence about the March 6 nightclub incident to rebut appellant=s alibi
testimony.  The State argued that appellant=s alibi defense
raised the issue of identity, and that the March 6 nightclub incident had
similar distinguishing characteristics upon which the jury could rely in
determining who fired the fatal shots at Berry=s house on March
2.

Appellant contended that the evidence he proffered did not
put identity at issue to the degree necessary to allow admission of evidence
about the March 6 nightclub incident because Timberlake and Washington were not
uncertain about appellant=s identity.  Appellant also contended that
any similarities between the March 2 and March 6 incidents were typical of any
drive-by shooting, and that any probative value from evidence about the March 6
nightclub incident was substantially outweighed by the danger of unfair
prejudice.

The trial court admitted evidence during rebuttal that
appellant fired a handgun during the March 6 nightclub incident.  The trial
court issued a limiting instruction directing the jury to consider this
evidence only to help it decide Awhether the
Defendant committed the offense that he is charged with.  And you may not
consider it for any other purpose.@  The jury charge
contained a similar instruction.

During rebuttal, the State recalled Officer Hoang to give
more details about the March 6 nightclub incident.  Officer Hoang testified
that appellant was arrested on March 6 and charged with the felony offense of
deadly conduct.  Officer Hoang did not testify that the March 6 incident
involved a shooting.








The State also recalled Chatmon to give rebuttal testimony
about the March 6 nightclub incident.  Chatmon testified that an argument
erupted between Chatmon=s friends and another group when a member
of the other group attempted to persuade Chatmon=s female friend to
leave the club with him.  Later, as Chatmon got to his car in the nightclub
parking lot, another car pulled up carrying appellant and others including the
man who had spoken with Chatmon=s friend.  Chatmon testified that one
occupant of the other car pointed a shotgun at him out of the car window, and
appellant fired a handgun out of the driver=s side window
while sitting in the passenger seat.  Chatmon further testified appellant had
switched to the driver=s seat of the car by the time he
identified appellant to Officer Hoang as the person who shot at him.

The jury convicted appellant of felony murder based on his
commission of an act causing Ross=s death in the
course of committing felony deadly conduct.  Appellant contends the trial court
abused its discretion by admitting evidence of the March 6 nightclub incident. 
Appellant asserts evidence of this extraneous offense should have been excluded
because (1) it was too remote in time to refute appellant=s alibi defense;
(2) it was not sufficiently similar to the charged offense to establish
appellant=s identity; and (3) any probative value was substantially
outweighed by the danger of unfair prejudice.  Appellant further contends his
defensive theories did not raise identity as an issue so as to allow an
extraneous offense to be used to establish appellant=s identity.

Standard of Review

We review a trial court=s decision to
admit or exclude evidence for abuse of discretion.  Torres v. State, 71 S.W.3d 758, 760 (Tex. Crim. App.
2002).  We will not reverse a trial court=s ruling unless that ruling falls
outside the zone of reasonable disagreement.  Id.  We cannot reverse a trial
court=s admissibility
decision solely because we disagree with it.  Powell v. State, 63 S.W.3d
435, 438 (Tex. Crim. App. 2001).  We must affirm a trial court=s ruling if it is
correct on any theory of law applicable to the case.  Martin v. State,
173 S.W.3d 463, 467 (Tex. Crim. App. 2005).

Analysis

I.        Preservation
of Error








The
State contends appellant failed to preserve his complaint regarding admission
of extraneous offense evidence before rebuttal because appellant did not object
based on the inadmissibility of character evidence under Rule 404(b) or based
on its probative value being substantially outweighed by the danger of unfair
prejudice under Rule 403.  

An
appellant=s issue on appeal must comport with the objection made at trial;
otherwise, the appellant has preserved nothing for review.  See Tex. R.
App. P. 33.1(a); Ibarra v. State, 11 S.W.3d 189, 197 (Tex. Crim. App.
1999).  During the State=s case-in-chief, appellant requested and was granted a
running objection to admission of evidence regarding the March 6 nightclub
incident based on lack of relevance and probative value.  Appellant does not
argue relevance on appeal; instead, he argues the evidence was inadmissible
character evidence under Rule 404(b) and that its probative value was substantially
outweighed by the danger of unfair prejudice under Rule 403.

A
relevance objection does not necessarily preserve a complaint under Rule 403 or Rule
404.  See Medina v. State, 7 S.W.3d 633, 643 (Tex. Crim. App. 1999) (en
banc); Bell v. State, 938 S.W.2d 35, 49 (Tex. Crim. App. 1996) (en banc,
per curiam); see also Lopez v. State, 200 S.W.3d 246, 251 (Tex. App.CHouston [14th
Dist.] 1994, pet. ref=d).  Appellant did not articulate an
objection on Rule 403 or Rule 404(b) grounds until the State requested
permission to offer rebuttal testimony.  Because appellant did not raise any
objection under Rules 403 or 404(b) during the State=s case-in-chief,
he cannot invoke these rules to complain about admission of this evidence
during the State=s case-in-chief.








Therefore, we do not address admissibility of the following
evidence about the March 6 incident presented during the State=s case-in-chief:
(1) Officer Hoang=s testimony that (i) a weapons incident
occurred at a nightclub on March 6, 2005; (ii) the complainant in that incident
flagged him down and pointed out appellant=s four-door maroon
Buick; (iii) the complainant claimed appellant had a gun in his hand during the
incident; (iv) appellant=s car was stopped and searched on March 6;
(v) a silver .380 handgun and a box of ammunition for the gun were found
underneath the rear driver=s side seat cushion; and (vi) a passenger
in appellant=s car was charged with possession of the handgun; (2)
Chatmon=s testimony that
he saw appellant at the same nightclub on March 6 with a silver gun in his hand
similar to the .380 handgun found in appellant=s car; and (3)
Lyons=s testimony that
the bullet recovered from Ross=s body after the March 2 shooting at Berry=s house was fired
from the same silver .380 handgun recovered from appellant=s car during the
March 6 traffic stop.

Appellant did object under Rules 403 and 404(b) to the
following testimony from Officer Hoang and Chatmon during rebuttal: (1) appellant was arrested on March
6, 2005 and charged with the felony offense of deadly conduct; (2) appellant
was with a group of people who engaged in an argument with Chatmon=s group of friends over one of the
women in Chatmon=s group; (3) appellant was seated in the passenger seat of
his car _ which pulled up near the car Chatmon
was walking toward _ and fired a handgun out of the driver=s side window of the car while
another man pointed a shotgun out of appellant=s car window; (4) appellant switched
to the driver=s seat of his car sometime between the shooting and the time officers
stopped his car; and (5) Chatmon identified appellant to Officer Hoang on March
6 as the person who shot at him.  We now consider the admissibility of this
evidence under Rules 403 and 404(b).

II.       Admissibility
Under Rule 404(b)

Evidence of other crimes, wrongs, or acts is not admissible
to prove the character of a person to show action in conformity therewith. 
Tex. R. Evid. 404(b).  Such evidence may be admissible for other purposes such
as proving identity.  Id.

The first step in determining whether evidence of an
extraneous offense is admissible is to determine whether the evidence is
relevant to a material issue other than the defendant=s character under
Rule 404(b).  Prieto v. State, 879 S.W.2d 295, 297 (Tex. App.CHouston [14th
Dist.] 1994, pet. ref=d).  Once an appropriate objection has
been lodged, the proponent of the evidence must demonstrate to the court that the
evidence has relevance apart from proving character conformity.  Lopez,
200 S.W.3d at 252. 








Extraneous offense evidence cannot be admitted to prove
identity until identity has been made an issue in the case.  Page v. State,
137 S.W.3d 75, 78 (Tex. Crim. App. 2004).  Challenging the credibility of
witnesses on a material detail of the identification sufficiently raises the
issue of identity to permit admission of extraneous offense evidence.  Id.
(citing Lane v. State, 933 S.W.2d 504, 519 (Tex. Crim. App. 1996)).  An
alibi defense also raises the issue of identity and permits admission of
extraneous offense evidence.  Booker v. State, 103 S.W.3d 521, 530 (Tex.
App.CFort Worth 2003,
pet. ref=d).

Appellant concedes his defensive theory of alibi raised
identity as an issue in this case, but contends it did not do so to the extent
necessary to permit admission of extraneous offense evidence.  Through his
alibi defense, however, appellant sufficiently raised identity as an issue to
permit the trial court to admit evidence of the March 6 nightclub incident
involving appellant.  See Page, 137 S.W.3d at 78; Booker, 103
S.W.3d at 530.

Merely raising the issue of identity does not render
evidence of an extraneous offense admissible unless the offenses are
sufficiently similar by (1) proximity in time and place, or (2) a common mode
of committing the offenses.  Dickson v. State, 246 S.W.3d 733, 742 (Tex.
App.CHouston [14th
Dist.] 2007, pet. ref=d) (citing Ransom v. State, 503
S.W.2d 810, 813 (Tex. Crim. App. 1974)).  Immaterial dissimilarities between
the charged crime and the extraneous offense do not automatically make the
extraneous offense inadmissible.  Dickson, 246 S.W.3d at 743 (citing Ransom,
503 S.W.2d at 813-14).

Appellant contends the March 6 nightclub incident was not
sufficiently similar to the charged offense to make evidence about that incident
admissible.  Appellant further contends that any similarities between the two
offenses do not constitute a common mode of committing the offense because
those similarities are common to all drive-by shootings.  Dickson
is instructive in addressing appellant=s arguments.








In Dickson, three separate robberies were committed
one evening at a particular Houston apartment complex.  Dickson, 246
S.W.3d at 736.  In the robbery with which the defendant was charged, the
assailant was running and repeating the phrase Acome get me@ as he approached
the victim.  Id.  The victim was walking his two dogs and accompanying
his wife to her car.  Id.  The victim=s dogs began
barking at the assailant as he ran past, at which point he turned around and
pointed a handgun at the dogs.  Id.  The assailant threatened to shoot
the dogs if the victim did not make them stop barking.  Id.  The
assailant then threatened to shoot the victim and his wife if they did not give
him their money.  Id. at 736-37.  The assailant ran away without taking
anything once a neighbor turned on his porch light and opened his front door.  Id.
at 737.

During its case-in-chief, the State presented evidence of
another robbery at the same apartment complex the same evening.  Id.  In
this second robbery, the assailant walked up to the victim as he was stepping
out of his van, put a gun to the victim=s throat, and
asked how much money he had.  Id.  Before the victim could retrieve his
wallet, the assailant struck him twice in the head with the gun.  Id. 
After obtaining the victim=s wallet, the assailant demanded the
victim=s cell phone and
struck him three times with the gun before the victim relinquished the phone.  Id. 
The assailant also kicked the victim in the ribs before leaving.  Id.

The State also called the victim of a third robbery at the
apartment complex that evening to testify regarding the assailant=s identity.  Id. 
This third victim was walking toward his apartment when his assailant addressed
him and asked Aif he needed a woman.@  Id.  When
the victim declined this offer, the assailant walked past him and turned around
brandishing a handgun.  Id.  The assailant demanded the victim=s money, then
struck him multiple times with the handgun before the victim could turn over
his wallet.  Id.  The assailant ran away after taking the victim=s wallet and cell
phone.  Id.








The defendant in Dickson contended that evidence of
the extraneous offenses was inadmissible to prove identity because the modes of
commission of the offenses differed.  Id. at 741.  Recognizing that
extraneous offense evidence may be admissible under Texas Rule of Evidence
404(b) to prove identity, Dickson noted that extraneous offenses may be
sufficiently similar to prove identity when there is either
proximity in time and place or a common mode of committing the
offenses.  Id. at 742.  We held that the offenses in question in Dickson
satisfied both requirements.  Id.

Regarding common mode of commission, we noted that in each
offense Athe robber
approached his victims as they walked to or from their apartments and
threatened them with a gun.@  Id. at 743.  We acknowledged that
the robber did not strike anyone or take anything during the first robbery _ the charged
offense _ but concluded
these differences were immaterial.  Id.  We then concluded that the
offenses were sufficiently similar to authorize admission of evidence of the
extraneous offenses to prove the issue of identity.  Id.

Appellant in this case similarly argues that the modes of
commission of the two offenses were not similar enough to deem evidence of the
March 6 nightclub shooting admissible.  Specifically, appellant contends the
following testimony from Officer Hoang and Chatmon was inadmissible during
rebuttal: (1) appellant
was arrested on March 6, 2005 and charged with the felony offense of deadly
conduct; (2) appellant was with a group of people who engaged in an argument
with Chatmon=s group of friends about one of the women in Chatmon=s group; (3) appellant was seated in
the passenger seat of his car _ which pulled up near the car Chatmon was approaching _ and fired a handgun out the driver=s side window of the car while
another man pointed a shotgun out of appellant=s car window; (4) appellant switched
to the driver=s seat of his car between the time of the shooting and the time officers
stopped his car; and (5) Chatmon identified appellant to Officer Hoang that
night as the person who shot at him.  Having already determined that appellant
made identity an issue in this case, we address the similarities between the
charged offense of March 2 and the March 6 nightclub incident to determine
whether the rebuttal evidence at issue was admissible.








The most obvious commonality between the shootings of March
2 and March 6 is that both resulted in allegations by the State that appellant
engaged in felony deadly conduct, and both shootings involved the same silver
.380 handgun.  Additionally, appellant is alleged to have fired the gun from
the driver=s side window of a maroon Buick in each instance, even
when he was sitting on the passenger side of the car on March 6.  Both
incidents occurred during or near the early morning hours, with the charged
offense occurring at approximately midnight and the March 6 offense shortly
after 2:00 a.m.  Furthermore, in each instance appellant was responding to a
perceived slight to one of his friends _ rather than to himself _ by conducting a
drive-by shooting.  In light of Dickson, we conclude that these
similarities are sufficient to indicate a common mode of commission and
therefore hold that the trial court did not abuse its discretion by admitting
evidence of the March 6 shooting.[1] 
See Torres, 71 S.W.3d at 760; Dickson, 246 S.W.3d at
742.

Appellant contends that the similarities between the
offenses in this case are not distinctive enough to act as appellant=s Asignature,@ and that they are
fairly common of most drive-by shootings.  Assuming appellant is correct that
unrelated similar factual scenarios do exist in case law with regard to
drive-by shootings, the same also could be said of the aggravated robberies at
issue in Dickson.  See, e.g., Williams v. State,
No. 14-07-01070-CR, 2008 WL 4735226 (Tex. App.CHouston [14th
Dist.] Oct. 30, 2008, pet. ref=d) (mem. op., not designated for
publication) (robber approached victim as he walked to cousin=s apartment and
held gun to his back); Carson v. State, Nos. 02-07-00158-CR,
02-07-00159-CR, 2008 WL 1867148 (Tex. App.CFort Worth Apr.
24, 2008, no pet.) (mem. op., not designated for publication) (two women robbed
at gunpoint five hours apart exiting their cars in apartment complex parking
lots); Taylor v. State, No. 08-05-00377-CR, 2007 WL 1219148 (Tex. App.CEl Paso Apr. 26,
2007, no pet.) (not designated for publication) (robber exited car with gun and
approached victim exiting car at her apartment complex).  








Each of the above aggravated robbery cases shared the same
broad characteristics of a robber approaching his victims as they walked to or
from their apartments and threatening them with a gun.  See Williams,
2008 WL 4735226, at *1; Carson, 2008 WL 1867148, at *1; Taylor,
2007 WL 1219148, at *1.  Despite the relative commonality of these broad
characteristics, the Dickson court held that they were sufficiently
similar to each other to be admissible.  See Dickson, 246 S.W.3d at
743.  Thus, we conclude this evidence is admissible under Rule 404(b).

III.      Admissibility
Under Rule 403

Appellant also contends the trial court erred in admitting
the extraneous offense evidence because any probative value was substantially
outweighed by the danger of unfair prejudice.  See Tex. R. Evid. 403; see
also Lane, 933 S.W.2d at 520.  It is the opponent=s burden to
demonstrate that the danger of unfair prejudice substantially outweighs
probative value.  Sosa v. State, 230 S.W.3d 192, 195 (Tex. App.CHouston [14th
Dist.] 2005, pet. ref=d).

 The trial court weighs four factors under Rule 403: (1)
how compellingly the evidence serves to make more or less probable a fact of
consequence; (2) the potential the extraneous offense has to irrationally yet
indelibly impress the jury; (3) how much trial time the proponent needs to
develop the evidence; and (4) how great the proponent=s need is for the
extraneous transaction.  Lane, 933 S.W.2d at 520.

Where the two offenses in question are strikingly similar,
the extraneous offense evidence is highly relevant and has strong probative
value even when the offenses are a decade apart.  See id.  As we have
already held that the March 6 shooting shared striking similarities with the
charged offense in this case _ including the same weapon and car and
similar motive _ the first of these factors weighs in favor of
admitting the evidence.  See id.








While evidence of an extremely similar extraneous offense
always carries the potential to impress the jury of a defendant=s conformity with
bad character, this inference can be minimized through a limiting instruction. 
See id.  In this case, the trial court issued a limiting instruction
before evidence of the extraneous offense was offered on rebuttal.  The jury
charge also included a limiting instruction.  We generally presume the jury follows the trial court=s instructions, including a limiting
instruction regarding certain testimony.  Adams v. State, 179 S.W.3d
161, 165 (Tex. App.CAmarillo 2005, no pet.) (citing Waldo v. State, 746
S.W.2d 750, 754 (Tex. Crim. App. 1988) (en banc)).  We believe these
safeguards adequately insulated appellant from conviction based on character
evidence and therefore decide the second factor of the Rule 403 analysis weighs
in favor of admitting the evidence.  See Lane, 933 S.W.2d at 520.

The Court of Criminal Appeals has held that devoting nearly
one full day of a five-day trial to extraneous offense evidence is not excessive
and militates in favor of admitting the evidence.  See id.  During
rebuttal, the State spent just over 22 pages of the trial record conducting
direct and re-direct examinations of Officer Hoang and Chatmon developing
evidence of the March 6 nightclub incident.  Considering that the trial record
in this case covers nearly 450 pages _ not including closing arguments _ we conclude that
the third factor of the Rule 403 analysis weighs in favor of admitting the
evidence.  See id.

Finally, where identity is challenged by virtue of the
accused=s chosen defense,
the State=s need for extraneous offense evidence speaking to
identity is strong.  See id. at 520-21.  As noted earlier, appellant=s alibi defense
and challenges to the credibility of Timberlake and Washington raised identity
as an issue in this case; in fact, identity was arguably the only
genuine issue.  In light of the importance of proving the identity of the
perpetrator in this case, the State had a strong need for the challenged
evidence, and this fourth factor therefore also weighs in favor of its
admission.  See id.

Under the circumstances of this case, we cannot say that
the trial court abused its discretion in deciding the probative value of the
evidence of the March 6 nightclub shooting was not substantially outweighed by
any prejudicial impact it may have had.  See Torres, 71 S.W.3d at 760; Lane, 933 S.W.2d at
520-21.

We
overrule appellant=s issue regarding admission of evidence of an extraneous
offense.








Conclusion

The
trial court=s judgment is affirmed.

 

/s/        William
J. Boyce

Justice

 

Panel consists of Justices Frost, Brown, and Boyce.

Do not publish C Tex.
R. App. P. 47.2(b).









[1]           Because we decide that evidence concerning
the March 6 nightclub incident was admissible to prove appellant=s identity based on a common mode of commission of the
offenses, we do not address whether this evidence was too remote in time.  See
Martin, 173 S.W.3d at 467.