# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-09-00160-CR

Essa M'Bowe, Appellant

v.

The State of Texas, Appellee

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT
D-1-DC-08-300062, HONORABLE FRED A. MOORE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Essa M'Bowe of murder, *see* Tex. Penal Code Ann. § 19.02 (West 2003), and sentenced him to forty-five years in prison. M'Bowe argues that the district court abused its discretion by admitting evidence of an extraneous offense and by refusing to allow additional questioning of two potential jurors. We affirm the judgment of conviction.

In the early morning hours of December 23, 2007, police responded to a report that gunshots had been fired near a group of fourplexes at the 8200 block of Sam Rayburn Drive in Austin. When officers arrived on the scene, they observed a group of Hispanic males drinking and listening to music in the parking lot. About twenty to thirty feet from the group, officers found a Hispanic male, Efraim Jaimes, lying on his back next to a vehicle. He was alive, but was having difficulty breathing and communicating. Although Jaimes was unable to speak, he was able to

show officers a small puncture wound in his abdomen. Jaimes died shortly after being transported to the hospital.

Police secured the scene and conducted an investigation. The group of Hispanic males seemed to be unaware that a shooting had occurred. Officers questioned other potential witnesses, but were unable to procure any reliable information. Eventually, they spoke to Romualdo Diaz-Sosa, who had been in the parking lot with his brother and a friend at the time of the shooting. The men had noticed a white car arrive in the area shortly before the shooting. After hearing a sound like a firecracker, they observed eight to ten African-American males running from the scene. Some of the men left in the white car while others scattered in different directions. Diaz-Sosa and his friends heard a moaning sound and, upon investigation, found Jaimes lying on the ground. They then called the police.

Several days later, on January 4, 2008, police were contacted by Alton LaPoint, who, at the time, was in custody in the Travis County jail, having been charged with unlawful possession of a firearm by a felon. LaPoint admitted to being at 8200 Sam Rayburn Drive at the time of the shooting and identified M'Bowe as the person who had shot and killed Jaimes. According to LaPoint, he, M'Bowe, and several other men had been at a recording studio in the hours before the shooting. At the studio, M'Bowe had been showing off a black revolver with a brown handle. When the men had finished at the studio, M'Bowe drove several of the men, including M'Bowe's brother, Larry Egins, Terrance Anderson, and LaPoint, to the 8200 block of Sam Rayburn Drive, to sell drugs. The men exited the vehicle and went their separate ways. Both Egins and Anderson testified that, after the men exited the vehicle, they saw M'Bowe trying to

2

sell drugs to a Hispanic man. After a gunshot was heard, the men returned to the car. Egins testified that, when he returned to the car, he saw M'Bowe holding a black revolver with a brown handle. According to LaPoint, once everyone was back in the car, M'Bowe told LaPoint that he had shot someone and that "he gonna feel it in the morning." Egins corroborated this testimony and also testified that M'Bowe further stated: "I shot that bitch in the stomach."

Based on the information they had learned, police began searching for M'Bowe. They eventually located him and followed him to an apartment complex at 14100 Thermal Drive. Through further investigation, police determined that M'Bowe was inside the apartment of Laura Ann Roy, the girlfriend of either Justin Newman or James Wilson, who both associated with M'Bowe. When M'Bowe left the apartment, accompanied by Newman and Wilson, he was arrested.

Police obtained a warrant to search Roy's apartment and recovered a black gun with a brown handle and ammunition. Testing revealed that the gun was the weapon that killed Jaimes. The bullets found in Roy's apartment were similar to the bullet taken from Jaimes's body. DNA testing showed that M'Bowe could not be excluded as a contributor to the DNA samples taken from the handle of the gun or as a contributor to the DNA samples taken from the trigger guard, hammer, and cylinder release of the gun. Although Newman could be excluded as a contributor to the DNA found on the handle of the gun, he could not be excluded as a contributor to the DNA found on the trigger guard, hammer, and cylinder release of the gun.

On February 27, 2008, M'Bowe was indicted for murder. On February 12, 2009, a jury found M'Bowe guilty as charged. The jury assessed punishment at forty-five years in prison. In four issues, M'Bowe argues that the district court erred in allowing the State to introduce evidence

3

of a prior offense of aggravated robbery. According to M'Bowe, the evidence is not relevant for any purpose other than to show character conformity and, therefore, is not admissible under rule 404(b), and, even if relevant, the evidence was unfairly prejudicial under rule 403. *See* Tex. R. Evid. 403, 404(b). In a fifth issue, M'Bowe argues that the district court abused its discretion in refusing to allow further questioning of certain potential jurors.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Shuffield v. State*, 189 S.W.3d 782, 793 (Tex. Crim. App. 2006). Unless the trial court's decision was outside the zone of reasonable disagreement, we uphold the ruling. *Id.*; *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g).

An accused may not be tried for being a criminal generally. *Couret v. State*, 792 S.W.2d 106, 107 (Tex. Crim. App. 1990). Evidence of other crimes, wrongs, or acts is not admissible if it does nothing more than establish the bad character of an accused person in order to show action in conformity therewith. Tex. R. Evid. 404(b). However, this type of evidence may be admissible if it has relevance to a material issue in the case apart from its tendency to prove the character of the defendant. *Page v. State*, 125 S.W.3d 640, 649 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Permissible purposes for which evidence of "other crimes, wrongs or acts" may be admitted include the following: "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Tex. R. Evid. 404(b). Additionally, extraneous evidence may be relevant and admissible to rebut a defensive theory. *Roberts v. State*, 29 S.W.3d 596, 601 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd).

Here, M'Bowe's defensive theories raised the issue of identity. Although all evidence supported the fact that M'Bowe was present at the scene of the crime, several other men were also present, including LaPoint, Egins, and Anderson, three of M'Bowe's associates that night, who also testified at trial. In his cross-examination of these witnesses, defense counsel raised the possibility that one of the other men could have been the shooter. Defense counsel expressly asked LaPoint if he, LaPoint, had been the shooter and was now trying to frame M'Bowe. He also questioned the credibility of the other witnesses, specifically asking Egins if he would lie to protect LaPoint.

Evidence of an extraneous act is admissible to prove identity, when identity is an issue, only if there is some distinguishing characteristic common to both the extraneous offense and the offense for which the accused is on trial. *Ransom v. State*, 503 S.W.2d 810, 812 (Tex. Crim. App. 1974). The common distinguishing characteristic may be the proximity in time and place or the common mode of the commission of the offenses. *Id.* (citing *Ford v. State*, 484 S.W.2d 727, 729 (Tex. Crim. App. 1972)); *see also Lane v. State*, 933 S.W.2d 504, 519 (Tex. Crim. App. 1996). Here, in an attempt to prove that the shooter was M'Bowe and not LaPoint or one of the other men at the scene, the State introduced evidence that, on December 13, 2007, ten days before Jaimes's murder, M'Bowe possessed a distinctive gun whose description matched that of the gun used to kill Jaimes. Although this evidence related to an aggravated robbery, the district court attempted to limit the evidence presented to the jury to evidence of possession—evidence that, ten days before Jaimes's murder, M'Bowe had been in possession of a black revolver with a brown handle. It was this act—the act of possessing a weapon matching the description of the murder weapon, not the offense of aggravated robbery—that the State was required to prove beyond a reasonable doubt. *See*

5

*Harrell v. State*, 884 S.W.2d 154, 159 (Tex. Crim. App. 1994) (holding that standard of admissibility for extraneous offense evidence is proof beyond reasonable doubt).

The State's evidence included the testimony of Emmanuel Niembro. Niembro testified that on December 13, 2007, he had encountered a black male holding a black revolver with a brown handle. Niembro testified that, soon after the December 13 incident, he had identified M'Bowe from a live lineup as the man who had been holding the revolver. Likewise, at trial, Niembro made an in-court identification of M'Bowe as the man he had encountered. In addition, Niembro identified the revolver recovered from Roy's apartment—the revolver determined to be the murder weapon—as similar to the one he had observed M'Bowe holding on December 13, 2007. Niembro also testified that M'Bowe had touched his car.

Following Niembro's testimony, the State presented the testimony of Officer Rolando Fuertes, who was at the scene on the night Niembro encountered M'Bowe. Fuertes testified that he had lifted fingerprints from Niembro's vehicle. Bonnie Manno, a latent print examiner, testified that those prints matched M'Bowe's.

The record demonstrates that the State's extraneous act evidence—evidence that M'Bowe possessed a weapon matching the description of the murder weapon ten days before the murder—was presented for a purpose other than to show character conformity, as required by rule 404(b). The identity of the shooter was a central issue in the case, and evidence that, only ten days before Jaimes's murder, M'Bowe was in possession of a distinctive weapon matching the description of the murder weapon tends to make it more likely that M'Bowe, rather than one of the other men present at the scene, was also in possession of the weapon when Jaimes was shot.

6

The evidence was not admitted to show that M'Bowe committed an aggravated robbery. Indeed, there was no direct evidence that an aggravated robbery had occurred. The common act was the possession of a distinctive weapon—a black revolver with a brown handle. The district court's decision to admit this evidence under rule 404(b)—as having relevance beyond its tendency to show character conformity—was within the zone of reasonable disagreement. *See Montgomery*, 810 S.W.2d at 391. Accordingly, we overrule M'Bowe's first and third issues.

Having determined that the evidence was of a similar act that tends to show identity and was, therefore, admissible under rule 404(b), we next consider whether the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 403. Rule 403 objections are to be analyzed by balancing: (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006).

An analysis of each of these six factors supports the district court's decision to admit the evidence in question. Evidence that M'Bowe possessed a distinctive weapon matching the description of the murder weapon "strongly serves to make more [] probable" the fact that M'Bowe was in possession of a weapon matching that description when Jaimes was shot. *See id.* at 641. The

7

defense called into question the reliability of the other witnesses, suggesting that LaPoint had been the shooter and that the others were lying to protect LaPoint. Consequently, evidence that, only ten days before, M'Bowe had been in possession of a weapon whose description matched that of the weapon used to kill Jaimes became relevant to establish the shooter's identity and counter the defense that LaPoint was the shooter. In addition, the evidence was limited to the specific act of M'Bowe's having possessed the gun.

As for the Niembro incident, the State's extraneous act evidence had little tendency to suggest a decision by the jury on an improper basis or to confuse or distract the jury from the main issues. Whether M'Bowe was or had been in possession of the weapon—the fact that the State sought to prove by introducing evidence of the encounter with Niembro—was directly relevant to the question of who was more likely to be the shooter. Identity was a central, disputed issue, and the evidence of the Niembro encounter presented by the State was limited to evidence that, ten days before the murder, M'Bowe was in possession of a distinctive weapon whose description matched that of the murder weapon.

However, as M'Bowe points out, although limited, the evidence relating to the Niembro encounter did include some evidence to suggest that a criminal act had been committed. This evidence includes Niembro's statement that he had identified M'Bowe from a live lineup and the testimony of both Manno and Officer Fuertes that M'Bowe's fingerprints had been lifted from Niembro's vehicle.[1] While we agree with M'Bowe that the evidence could have suggested to the

---

[1] The State contends that M'Bowe's rule 403 objection was not preserved as to Manno and Fuertes, but the record shows that, in express reference to the fingerprint evidence, defense counsel argued:

jury that some sort of criminal act might have been committed, there was no direct evidence that a criminal act had been committed, that M'Bowe had been charged, or that the act was aggravated robbery. There was also no indication that M'Bowe had been convicted—or even indicted—for any crime and, indeed, in the absence of such evidence, the jury might well have inferred that, despite police involvement, there was no indictment or conviction at all. The evidence indicated only that both the police and M'Bowe had been involved in the incident in some manner.

As explained, the evidence was presented to show that M'Bowe had been in possession of a weapon similar to the murder weapon only ten days before the murder. The district court's decision that the probative value of this evidence, which tends to prove one of the central issues in the case, outweighs the danger of unfair prejudice is within the zone of reasonable disagreement. While it is questionable whether, in light of Niembro's testimony, the testimony of Manno and Officer Fuertes was also necessary, given the deference afforded to the trial court in making evidentiary rulings, we cannot say that the court's decision to admit the evidence was outside the zone of reasonable disagreement. *See Montgomery*, 810 S.W.2d at 391; *Jones v. State*, 119 S.W.3d 412, 419 (Tex. App.—Fort Worth 2003, no pet.) ("[A] reviewing court is to reverse the trial court's judgment rarely and only after a clear abuse of discretion, recognizing that the trial court

---

Any reasonable juror would conclude that a prior bad act had occurred, and that's character conformity evidence which is clearly inadmissible. Unless that weapon can be identified beyond a reasonable doubt, then the proposed evidence is substantially outweighed by the danger of unfair prejudice pursuant to Rule 403.

M'Bowe's objection to the fingerprint evidence, which made express reference to rule 403, was sufficient to preserve error. *See* Tex. R. App. P. 33.1.

is in a superior position to gauge the impact of the relevant evidence."). Accordingly, we overrule M'Bowe's second and fourth issues.

In his fifth issue, M'Bowe argues that the district court abused its discretion by granting two of the State's challenges for cause while refusing M'Bowe the opportunity to rehabilitate the jurors or to make a bill of exceptions. The State contends that there was no error because defense counsel was allowed to ask his questions and was prevented from asking further questions only after the State had made its challenges for cause.

The trial court has broad discretion over the process of selecting a jury. *Sells v. State*, 121 S.W.3d 748, 755-56 (Tex. Crim. App. 2003), *cert. denied*, 540 U.S. 986 (2003). Voir dire could go on indefinitely if the trial court did not have the ability to impose reasonable limits on it. *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002). A trial court abuses its discretion only when it prohibits a proper question about a proper area of inquiry. *Id.* A question is proper if it seeks to discover a juror's views on an issue applicable to the case. *Id.*

M'Bowe's specific challenge pertains to potential jurors Trull and Dangerfield and their responses to questions regarding the State's burden of proof. The discussion regarding the State's burden of proof was begun by the State and directed to the full venire panel. State's counsel described the difference between "beyond all reasonable doubt" and "beyond all doubt" and questioned the potential jurors as to their understanding of these standards—whether they would hold the State to a burden of proving beyond a reasonable doubt or if they would require the State to prove its case beyond all doubt. This exchange ensued between the State and potential juror Dones, an exchange eventually joined by Dangerfield and Trull:

10

| | |
|---|---|
| Dones: | I guess I would have to say against everybody else, all doubt. I mean, a murder case is very serious to me. |
| State's counsel: | Yes, ma'am, it is. |
| Dones: | I don't want to just say they did it. I'm not comfortable with that. |
| . . . . | |
| Dones: | For me, I would say all doubt. |
| State's counsel: | Okay. That's what I needed to know. Thank you. Yes, sir, Mr. Dangerfield? |
| Dangerfield: | Now that I have learned more, yeah, I would agree with her, too. Yeah. |
| State's counsel: | So, again, my hypothetical of three witnesses coming to testify—I mean, we still have to prove to you the case, okay? But I am saying three witnesses come in, you believe them beyond a reasonable doubt; however there is not DNA. There is, you know, things that you are like, gosh, I really wish they had that, but I believe everything that those witnesses said. Would you be able to hold the State to beyond a reasonable doubt and not to beyond all doubt? |
| Dangerfield: | Still all doubt. |
| . . . . | |
| Trull: | I'm a little iffy. Since it's murder, I'm going to go with all doubt. |

At this point, the court interrupted and explained the standards of proof at length, attempting to clarify the differences between the two standards and explaining the virtual impossibility of proving something beyond all doubt. The court explained that the only way to know beyond all doubt that something happened is to observe it oneself, and if a person observes the

conduct at issue, he is no longer a juror, but a witness. Still, when questioned again, Trull and Dangerfield asserted that they would require the State to prove its case beyond all doubt.

Defense counsel also had the opportunity to discuss the issue with the venire panel. Defense counsel explained the burdens by describing the universe of "all doubt" divided into either reasonable doubt or unreasonable doubt and continued:

> Those of you who said beyond all doubt, knowing that the other kind of doubt is unreasonable doubt, would you require the State to prove their case to you beyond unreasonable doubt?

The court again interrupted and attempted to clarify further, and defense counsel further explained the standard, also discussing potential differences between the words "all reasonable doubt" and "a reasonable doubt." After an extensive discussion, but without further individual questioning of Trull or Dangerfield, defense counsel moved on to other matters.

At the conclusion of voir dire, the State challenged potential jurors Trull and Dangerfield, among others, for cause. The court commented that:

> Those are the people who even after I interrupted numerous times said that they would require the State of Texas to prove guilt beyond all doubt in a criminal case.

The court then sustained the State's challenges. Defense counsel objected, stating that Trull and Dangerfield were just confused. The court refused to allow further questioning, stating that the law had been explained multiple times by both sides and by the court itself. Defense counsel then asked

12

to make a bill of exception by speaking to each potential juror individually. The court refused, stating that defense counsel had the opportunity to speak to them individually during voir dire.

According to M'Bowe, the evidence shows that potential jurors Trull and Dangerfield were "at best unsure" or "vacillating juror[s]," and defense counsel should have been permitted to question them further before they were excluded from the jury panel. As a matter of procedure, we find no abuse of discretion in the district court's refusal to allow further questioning. Defense counsel had ample opportunity to rehabilitate these potential jurors during voir dire.

The record shows that the district court allowed virtually unlimited questioning of these potential jurors during voir dire. Further, the correct legal standard was repeatedly explained to Trull and Dangerfield and, even after extensive discussion, both still said that they would hold the State to proof beyond all doubt, rather than proof beyond a reasonable doubt. After extensive questioning, the district court exercised its discretion to determine that these potential jurors were biased or prejudiced rather than merely confused. On this record, we cannot say that the court's decision to prohibit further individual questioning after the State challenged Trull and Dangerfield for cause—either for purposes of rehabilitation or for purposes of a bill of exception—was an abuse of discretion. *See Sells*, 121 S.W.3d at 755-56; *Barajas*, 93 S.W.3d at 38. Accordingly, we overrule M'Bowe's fifth issue.

Having overruled each of M'Bowe's issues, we affirm the judgment of conviction.

_____

G. Alan Waldrop, Justice

Before Chief Justice Jones, Justices Pemberton and Waldrop

Affirmed

Filed:  May 27, 2010

Do Not Publish